166 P.2d 943

**COMMERCIAL LIFE INS. CO. v. WRIGHT et al.**

No. 4867.

Supreme Court of Arizona.

March 11, 1946.

Moore, Romley & Roca, of Phoenix, for petitioner.

John L. Sullivan, Atty. Gen., and Harry O. Juliani, Asst. Atty. Gen., for respondents.

LA PRADE, Judge.

On the 15th day of November, 1945, a writ of certiorari was issued out of this court directed to the respondents requiring them to certify to this court a complete transcript of the records and proceedings before the Arizona Corporation Commission in its Docket 9724–B–2890, wherein Commercial Life Insurance Company appeared as an applicant for a permit to issue certain securities and was granted such permit, and wherein such permit was later amended and in part revoked, this to the end that the court might review the said proceedings and determine whether the said Arizona Corporation Commission had regularly pursued its lawful jurisdiction and authority. Prior to the return date of the writ, respondents filed a motion to quash the writ and a document designated as an answer, containing matter by way of justification. An answer constitutes a pleading unknown to the statutory proceeding of certiorari, and is not authorized or permitted. The purpose of the writ is to review the proceedings and acts of inferior tribunals, boards, or officers exercising judicial functions to determine whether the jurisdiction of such inferior tribunal, board, or officer has been exceeded, and there is no appeal. Section 28-101, A.C.A.1939; In re Farish, 18 Ariz. 298, 158 P. 845; Faulkner v. Board of Supervisors, 17 Ariz. 139, 149 P. 382. We have treated the answer as a brief in support of the motion to quash.

The grounds for the motion to quash are (1) that there is now pending in the Superior Court of Maricopa County an action between the parties hereto in which the identical questions involved herein are being litigated, (2) that petitioner has no right to file an original application for a writ of certiorari, he not having shown special circumstances which render it proper to sue in this court.

A short synopsis of the petition for the writ discloses the following fact situation: Commercial Life Insurance Company, petitioner herein, is incorporated as a domestic life insurance company, and on April 10, 1945, secured from respondent Commission permission to issue and sell its capital stock to the extent of $100,000 in Founders' Shares. The permission was conditioned upon the stock's being sold in accordance with a certain trust agreement and the provisions of the trust agreement were approved by the Commission.

Each trust agreement is a contract between three corporations and one individual, and by its execution the various parties made substantially these agreements: (1) The individual signer, designated as "trustor," assigns to The Phoenix Savings Bank and Trust Company (an Arizona banking association) such future dividends as may become payable to him by reason of his ownership of a benefit certificate issued by Commercial Benefit Insurance Company (an Arizona benefit insurance corporation) and agrees that such dividends may be used for the eventual purchase, in his name, of petitioner's capital stock; (2) Commercial Benefit consents to the assignment and agrees to pay the assigned dividends, when payable, to the bank; (3) the bank consents to act as trustee, to hold all funds so deposited in a trust fund, and to deliver the fund to petitioner when it equals $100,000; (4) petitioner agrees upon receipt of the $100,000 to issue shares of its capital stock to trustor in an amount equal to his share in the fund.

Following respondents' approval of the foregoing plan of stock issuance, and in accordance with the permission of April 10, 1945, petitioner secured the execution of numerous counterparts of the original trust agreement by policyholders in Commercial Benefit throughout Arizona.

On September 10, 1945, the Attorney General of Arizona transmitted to respondent's Director of Insurance an opinion in writing wherein he characterized the trust agreement as forbidden by statute, in derogation of law, ultra vires, void, and invalid; and suggested that the Commission was authorized to order a refund to the trustors of any sums which might have been deposited with the bank under the terms of the agreement.

Acting in accordance with this opinion and basing their order solely on such opinion recited therein in full, respondents issued their Decision No. 15809 on September 22, 1945, and in that decision amended and revoked the permission of April 10, 1945, to the extent that the April order approved the trust agreement, and further required the bank, the benefit company (neither of which was a party to the original proceedings before the Corporation Commission) and petitioner to refund to the trustors any sums which might have theretofore been placed in trust with the bank.

The specific objections of the Attorney General which prompted the revocation

were: (1) That by the agreement the benefit company agrees with petitioner to deliver to trustee the surplus dividends from its mortuary fund. (2) That by the agreement the benefit company was attempting to deviate its mortuary fund to a purpose not only unauthorized but actually forbidden, relying upon the provisions contained in sections 61-1009 and 61-1010. The latter section defines the powers of the benefit corporation. Section 61-1009 provides for the creation of a mortuary fund, its use, and disposition. (3) That the trust agreement was signed only by the corporate parties and not by the policyholders of the benefit company. (4) That the trust agreement was in derogation of the Benefit Insurance Corporation Act of 1943, Code 1939, § 61-1001 et seq., and as to the benefit company was ultra vires and void. (5) That the trust agreement was void as to the Commercial Life because the statute (section 61-324, A.C.A.1939) prohibits an insurance company from including in its capital assets any property of another insurance company.

The petitioner further alleged that there was no review from the order of the Commission amending and revoking in part the original permit; that dividends from the benefit company would become due and payable shortly after January 1, 1946, and by the terms of the trust agreement and assignments would be payable to the trustee, and, that if the order of revocation was not set aside, it would suffer irreparable injury thereby.

The so-called dividends referred to in the trust agreement, if made by the benefit company, were really refunds of premiums paid and made under the authority of the section 61-1009, supra, and as we shall hereafter point out subject to disposition by the owner of the refund.

The petitioner was incorporated as a life insurance company in June, 1944, under the provisions of Charter 61, A.C.A. 1939, and was subject to the regulations provided in Article 3 of said chapter. It had not qualified to do business for the reason that it had not complied with the provisions of section 61-202, which require that no stock insurance company shall make life insurance in this state without having a capital stock fully paid up of at least $100,000. It was the evident intent and purpose of the company to secure this $100,000 by the sale of its stock to holders of certificates in the benefit company. The benefit company was organized under the provisions of Article 10 of Chapter 61. Under section 61-1009 of said chapter, a mortuary fund is created from the premiums paid by the certificate holders, which fund must be used for a special purpose only, as shown by the following quotations from the section:

"(b) The mortuary fund shall be used exclusively for the fulfillment of the policy contract and for no other purpose, * · *"

"(c) During any calendar year should the contributions to the mortuary fund exceed the amount required to pay all benefit claims arising during the same calendar year, the company may, in accordance with a provision in the certificate, *make a refund to the certificate holders not to exceed fifty (50) per cent of the amount contributed by the certificate holder to the fund.*" (Emphasis supplied)

As to the alleged insufficiency of the petition for the writ the argument made by respondent could be heard only on a return to an order to show cause why a writ should not be issued. This court, having taken jurisdiction and ordered the issuance of the writ, will not now review its own determination that the petition sufficiently justified its order.

With reference to the first ground of the motion to quash the writ, it appears that petitioner did file an action in the superior court against respondents prior to seeking the issuance of the writ in this court, which action was pending and then undetermined. The superior court action was based on section 69-249, A.C.A.1939, which provides for a trial de novo in the superior court to set aside orders of the Corporation Commission. To the complaint in that action the respondents, defendants there, filed a motion to dismiss on the ground that the order here under attack is not of the type which is subject to a hearing de novo under the provisions of said section 69-149. Counsel for petitioner, being of the opinion that the mo-

tion to dismiss in the superior court was good, advised their client to file the petition herein. Their opinion was prompted by the holding of this court in the case of Johnson v. Betts, 21 Ariz. 365, 188 P. 271. In this case it appeared that Johnson was the licensed agent of the New York Life Insurance Company. Charges were filed against him with the Corporation Commission, seeking a revocation of his license. A hearing was had by the Commission on the charges, which resulted in a decision exonerating him. Three months later a motion was filed with the Commission for a rehearing, which motion was granted. On appeal to this court, a writ of prohibition was ordered directing the Commission to desist and prohibiting a rehearing. It was the position of the Commission that it had authority to grant a rehearing by virtue of the authority granted in paragraphs 2336, 2337, and 2342, R.S.1913, being a part of the "Public Service Corporation Act." Paragraph 2343, R.S.1913, was the forerunner of our present section 69-249, A.C.A.1939, authorizing a trial de novo to contest orders or decisions of the Commission. With reference to this attempted justification, this court held [21 Ariz. 365, 188 P. 273]:

"* * * These provisions, however, have reference to proceedings before the commission affecting public utilities. A casual reading of them is enough to convince one of this. The act of which they are a part treats of public service corporations and their control and supervision by

the commission, and the procedure therein provided was not intended to extend to a hearing or proceeding authorized by some other statute or law, to be had or held by the commission. While the language employed in paragraph 2329, Civil Code, being also a part of the 'Public Service Corporation Act,' is broad enough to cover and include a proceeding like this one we are considering, it clearly was not the legislative intent to have it do so, for the reason that the 'Public Service Corporation Act,' as originally passed (Act 90, Reg.Sess. 1st Leg.1912), did not directly or by implication extend its provisions to proceedings before the commission affecting insurance companies. 'All hearings and investigations -before the commission or any commissioner,' as used in paragraph 2329, must therefore be limited to refer to hearings and investigations before the commission or a commissioner affecting a public service corporation."

▆▆▆ We concur in the reasoning in the Johnson case and the holding therein is decisive of 'respondents' motion to dismiss the complaint in the superior court. Petitioner was correct in perceiving that it had misconceived its remedy and could secure no relief in the superior court action. The pendency of a wholly ineffective action in the superior court does not preclude this court from granting relief where the same is authorized and should be granted.

Petitioner's one assignment of error is to the effect that the order of the Commission amending and revoking the permit in part is unjust and unlawful and in excess of its jurisdiction. Some nine propositions of law are proffered in support of the assignment. We do not deem it necessary to consider all of the propositions. Disposition of the issue presented can be made by taking cognizance of four of them. They are:

I. The Arizona Corporation Commission has no jurisdiction over investment companies not specifically given it by statute.

II. The Arizona Corporation Commission has no power to re-examine, reconsider, review, amend or revoke a permit to issue securities except as such power is given it by statute.

III. The statutes of Arizona empower The Arizona Corporation Commission to amend or revoke a permit to issue securities only on application of the permittee or on the failure of the permittee to pay the fees established by law.

IV. Dividends which may become due under a life insurance policy may legally be assigned.

Respondent Commission attempts to justify its order amending and revoking in part the original permit by the authority contained in Article 11 of Chapter 53, A.C.A.1939. The code sections in Article 11 are 53-1101 to 53-1106, inclusive. It is the position of respondents that the original application filed by petitioner with the Commission for permission to sell its stock

was made under the provisions of Article 11. This article relates to "Dealers in Securities." The pertinent provisions of Article 11 read as follows:

"53-1101. *Definition of terms.*—As used in this article the term 'Securities' includes all stocks, bonds or other securities of any kind other than real property mortgages, and bonds of the United States, or of any state or of any county, city, town, school district, road district, improvement district or irrigation district;

"The term 'issuer' shall mean the person issuing said securities, and

"The term 'dealer' shall mean any person, not an investment company or its agent, who shall sell, offer to sell, or negotiate or advertise for the sale of securities to any person in the state of Arizona, but does not include an owner, not the issuer, who sells securities of which he is the actual owner, when such sale is not made in the course of repeated and successive transactions of a similar nature, nor one who in a trust capacity created by law, lawfully sells any securities embraced within such trusts."

"53-1102. *Application to commission to sell—Conditions of permit—Examination —Revocation.*—Every dealer before selling or offering to sell any securities shall make a written application for a permit therefor, to the corporation commission in such form and containing such information as the commission directs. The application shall not be for the securities or stock of more than one issuer, but more than one permit may be granted to the same dealer.

"The commission shall grant said permit if it finds from said application and further investigation, that the issuer is solvent, that his organization and methods and plans of doing business are fair, just and equitable to investors in his securities and that said securities, or the sale or methods of sale thereof, will not work a fraud upon the laws or the investors in said securities. The commission may make a detailed examination of the affairs of the issuer at the expense of the dealer or issuer, including a fee of ten dollars ($10.-00) per day for the time engaged in such examination and the expenses of the examiner. *The permit may be revoked by the commission at any time for cause sufficient to justify the refusal thereof in the first instance, or for failure on the part of the dealer to comply with the laws or any regulation, order or requirement of the commission."* (Emphasis supplied.)

It is the position of petitioner that its application for a permit to sell stock was made in conformity with the provisions of Article 10, Chapter 53, A.C.A.1939, relating to investment companies. See section 53-1001 et seq., A.C.A.1939. Investment companies are defined as follows:

"53-1001. *Defined.*—Every corporation, copartnership, and association (other than state and national banks, and corporations not organized for pecuniary profit) whether incorporated or unincorporated, which

shall sell or negotiate for the sale of any stock, bonds, or other securities of any kind other than bonds of the United States, of the state of Arizona, or of some county, city, town or school district therein, to any person in the state of Arizona, other than to those who associated themselves together to form such company and other than those specifically exempted herein, shall for the purpose of this article, be known as a domestic investment company, and if organized outside of this state, shall be known as a foreign investment company."

Section 53-1102 confers upon the Commission the authority to revoke permits granted to dealers in securities. Chapter 53, art. 11, relating to "Dealers in Securities," was first enacted in 1921. See Laws 1921, Chapter 33. The regular session of the legislature of 1912 adopted Chapter 69, commonly referred to as the "Blue Sky Law." The law was later codified as Chapter 9 of Title 9 of the 1913 Code; then as Chapter 38, Section 1887 et seq. in the 1928 Code. Provisions similar to those contained in Article 11 of Chapter 53, A.C.A.1939, concerning dealers in securities, are incorporated in the Blue Sky Laws of most states. In the State of Utah, the Blue Sky Law provides for two classes of corporations that may sell stock; the one being denominated as an "investment company" and the other a "dealer." The definitions contained in the Utah statute are similar to our statutes defining investment companies and dealers in securities.

See Laws of Utah 1919, page 309. In the case of National Bank of the Republic v. Price, 65 Utah 57, 234 P. 231, 236, the Supreme Court of Utah had occasion to point out the distinction between an "investment company" and a "dealer." In this behalf the court said:

"Taking into consideration all of the provisions of the act, it is obvious that an investment company is one that sells its own stock, and does not engage in the business of stock selling as a dealer does. In the case of Guaranty Mortgage Co. v. Wilcox, 62 Utah 184, 218 P. 133, 30 A.L.R. 1324, a corporation selling its own stock is classed as an investment company. Another reason for treatment as an investment company a corporation selling its own stock is the administrative interpretation of the law in harmony with the views expressed in the Wilcox case."

A dealer in securities has been likened unto a "merchant in securities." Leach Corporation v. Blacklidge, D.C.Ill., 23 F. Supp. 622, 626. The petitioner Commercial Life Insurance Company was not incorporated for the purpose of dealing in securities. It was organized for the sole purpose of making life insurance and under its charter and the statutes was limited to that activity. In order to qualify as a stock life insurance company it sought to sell its own stock, and in so doing it was compelled to secure a permit from the Corporation Commission and comply with the provisions of Article 10, Chapter 53, supra. In the case of Reilly v. Clyne, 27 Ariz. 432,

234 P. 35, 40 A.L.R. 1005, this court had occasion to consider what corporations were subject to the then-existing Blue Sky Law. In this case plaintiffs as trustees of the International Investment and Construction Association brought suit to recover on a promissory note that had been given to purchase some of its shares or units of stock. The company was declared to be what is commonly known as a "Massachusetts Trust" and was held to be a corporation within the meaning of the Investment Company Act. The company had not complied with the provisions of the Investment Company Act prior to offering its stock for sale. It was held that its stock had been issued without authority and in violation of the law and was therefore void, and recovery was denied on the promissory notes given in purchase of its stock. In support of the rule announced that business corporations (not organized for the purpose of dealing in securities) must comply with the Investment Company Act, we call attention to the following cases: United Bank & Trust Co. v. Joyner, 40 Ariz. 229, 11 P.2d 829, and Fidelity Building & Loan Ass'n v. Cox, 52 Ariz. 514, 84 P.2d 70. In the Joyner case the plaintiff brought an action to recover the amount alleged to be due on a subscription to buy treasury stock of the Tucson Independent Publishing Co., Inc. This corporation had been organized for the purpose of publishing a newspaper and conducting a printing business. It had not complied with the provisions of the Invest-ment Company Act (Blue Sky Law) prior to obtaining subscriptions for its stock. The court pointed out that such a corporation, before it could offer its stock for sale, had to comply with the Investment Company Act, and that having failed to do so the defendant giver of the note was privileged to plead the illegality of the contract and set it up as a lawful defense. This court specifically held that:

"* * * The company was unquestionably an 'investment company' as defined in paragraph 2259 (Civ. Code), R.S.A. 1913, and such companies were subject to strict regulation by statute, particularly by the following paragraphs in the Code of 1913 which were in force 'at the time the subscriptions were made." United Bank & Trust Co. v. Joyner, 40 Ariz. 229, 11 P.2d 829, 831.

The paragraphs referred to were 2260–2263, 2264, and 2270, R.S.1913, relating to investment companies, being substantially the provisions contained in Article 10, Chapter 53, supra.

In the Cox case, the corporation had been organized as a building and loan association and had complied with all the laws relating to building and loan associations and had been regularly licensed to do business as such, but it had not attempted to comply with the statutes relating to investment companies. It brought suit to recover on a note and mortgage. The mortgagor had also contracted to purchase stock in the building and loan association.

He had failed to complete his stock purchase. The contract provided that any payments made should be forfeited if he did not complete his stock purchase. On the foreclosure the mortgagor claimed a setoff of the amount that he had paid on the contract of stock purchase. He was sustained in this contention.

We conclude that petitioner at the time it incorporated was incorporated as a life insurance company and for the purpose of issuing and selling its capital stock was an investment company. The permit granted to it to sell its capital stock was made under the provisions of Article 10, Chapter 53, supra. The provisions of Article 11, Chapter 53, supra, have no application, and the specific authority contained in section 53-1102 authorizing the Commission to revoke licenses of dealers in securities is not applicable.

The Corporation Commission has no implied powers and its powers do not exceed those to be derived from a strict construction of the Constitution and implementing statutes. The foregoing rule was announced in the case of State v. Board of Supervisors, 14 Ariz. 222, 127 P. 727, 730. The declaration of the rule was there prompted by the fact that the board of supervisors sitting as a board of equalization had established and fixed the valuation of a certain mine. A month later they decided to reduce the valuation theretofore fixed and made an order accordingly. A writ of mandamus was issued compelling the board to re-establish the first valuation. In that behalf the court said:

"Boards of equalization are quasi judicial bodies, but inferior in their nature, and, in the exercise of the powers granted them by law, they must scrupulously limit their acts to doing those things that the law directly empowers them to do. They may not revoke, set aside, modify, or annul an order or decision of their own without the law grants them that right. * * *"

In Johnson v. Betts, 21 Ariz. 365, 188 P. 271, 273, we said: "It is well recognized that special tribunals exercising special summary powers must find their authority within the statute. They have no common-law powers nor implied powers, except such as are absolutely necessary to carry out those powers expressly granted them." The rule was reconsidered and affirmed in Hunt v. Schilling, 27 Ariz. 1, 229 P. 99, 100, in the following language:

"But has the land department the right to vacate and set aside its own orders? In passing on questions of this kind, it is acting judicially, and is bound by the rules pertinent to other judicial bodies of like nature, and, since it is a judicial body of limited jurisdiction, such right is governed by the statute which created it." Johnson v. Betts, 21 Ariz. 365, 188 P. 271; State v. Board, 14 Ariz. 222, 127 P. 727; Davis v. Campbell, 24 Ariz. 77, 206 P. 1078.

"No such power is given in the laws governing the land department. Therefore the order vacating the decision of April 3, 1921, was invalid, and the matter is still pending in the land department under said order. * * *"

On rehearing (27 Ariz. 235, 232 P. 554), the court declined to recede from the ruling, using this language:

"So far as the first point is concerned, we see no reason to recede from our original position. We have held squarely in at least two cases that inferior tribunals acting judicially cannot grant a rehearing and that their jurisdiction terminates with their decision. Johnson v. Betts, 21 Ariz. 365, 188 P. 271; State v. Board, 14 Ariz. 222, 127 P. 727. To hold now to the contrary would be to oppose the well-established law of this state and would be against the overwhelming weight of authority elsewhere. * * *"

■ While the Commission's specific constitutional power over the sale of securities is limited to inspection and investigation, Article 15, Section 4, Constitution of Arizona; Wylie v. Phœnix Assur. Co., Ltd. 42 Ariz. 133, 136, 22 P.2d 845, 846, the legislature may enlarge or extend the powers and duties of the Commission over the subject matter of which it has already been given jurisdiction, and other matters of the same class not expressly or impliedly exempt by other provisions of the Constitution. Article 15, Section 5, Constitution; *Menderson v. City of Phœnix*, 51 Ariz. 280, 76 P.2d 321.

Pursuant to constitutional authority (Article 15, Section 5), the legislature gave the Commission the powers over investment companies and the sale of securities to be found in Chapter 53, Article 10, supra. These powers are (1) to examine proposals for the public sale of securities, and (if it finds the proposal to be fair and equitable) to issue permits authorizing such sale, (2) to consent to changes in the plan of doing business and thus to amend such permits on request of the permittee, (3) to disapprove advertisements and circulars, (4) to prescribe methods for keeping the accounts of investment companies, and (5) to cause the attorney general to apply for the appointment of a receiver for an investment company under certain conditions. Penalties are provided for violation of the registration provisions, and an automatic forfeiture of permit is provided for failure to pay the fees of the Commission's investigators.

■ Article 10 of Chapter 53 (Blue Sky Law) is devoid of any provisions granting the Commission power to review, re-examine, reconsider, amend or revoke a permit to sell securities except as stated. Such being the case it follows that the Commission's jurisdiction over petitioner's plan of selling, and over the trust agreement by which its selling was accomplished, ceased absolutely on April 10, 1945, when petitioner's permit was granted. "The commission, having heard the evidence and rendered its decision thereon, was without power to make any other or further order looking

to a rehearing. Its jurisdiction terminated with its decision. * * *" Johnson v. Betts, supra.

In considering the effect of the agreement, resort to the following general principles of law is not only helpful but determinative of the issues herein. These general principles are:

"It may be laid down as a broad general rule that the right to receive money due or to become due under a contract may be assigned, even though the contract itself may not be assignable. * * *" 4 Am.Jur., Assignments, section 14.

"* * * an assignment of a debt not yet due and which may never become due is effective if it appears that there is an existing contract or employment out of which the debt may arise, * * *." 2 Williston on Contracts, Revised Edition, page 1183.

"Except as stated in section 151, a right expected to arise in the future, under a contract or employment in existence at the time of the assignment, can be effectively assigned." 1 Restatement of the Law, Contracts, vol. 1 sec. 154.

"It has been held that * * * dividends belong solely to the insured and may be secured by his creditors. * * *" 2 Appleman on Insurance Law and Practice, § 1345, page 806.

The trust agreement is without taint of illegality. It is an agreement by which certain trustors, being policy-holders in Commercial Benefit, and being entitled by virtue of their policies to share in any dividends which may be declared by Commercial Benefit, assign such future dividends, as they become payable, to the bank and agree that when a sufficient trust fund exists they will accept, in return therefor, the capital stock of petitioner. The agreement is made upon a sufficient consideration, and without doubt the holder of an insurance policy may assign to another the money to become due under the terms of the insurance contract, whether by dividend or otherwise.

We do not believe that there is any merit to the contention of the Attorney General that the benefit company by accepting assignments would be engaging in any illegal act, nor jeopardizing its assets to the injury of its certificate holders. The benefit company does not agree with the Commercial Life to deliver to the trustee the surplus dividends from its mortuary fund. The benefit company merely consents to the assignment by such of its policyholders as may choose to execute the trust agreement, and agrees to pay their dividends to the trustee. The Corporation Commission has complete power to see that benefit corporations charge proper premiums for benefit certificates issued and create out of premiums paid mortuary and reserve funds sufficient to pay benefit claims and general operating expenses. Section 61-1009, supra, and Pioneer, etc., Ass'n v. Corporation Com-

mission, 59 Ariz. 112, 123 P.2d 828. The same code section specifically authorizes refunds from the mortuary fund under certain circumstances.

We do not agree with the contention of the Attorney General that the trust agreement is void as to the Commercial Life Insurance Company upon the stated reason that it is in violation of section 61-324, A.C.A.1939. This section prohibits a life insurance company from including in its capital assets any property of another insurance company. A declared dividend is no part of the assets of the corporation, but is the property solely of the person to whom it is declared. If the owner of the dividend earned from the benefit company uses that dividend to purchase stock in the Commercial Life, the latter, having parted with its stock, will then own the money paid it, and it cannot be said that the money used to purchase the stock is capital, property, or assets of any other insurance company or organization, within the prohibition of section 61-324.

We conclude that respondent Commission having granted petitioner a permit to sell securities was without authority to amend or revoke the grant, and its invalid order of revocation is hereby set aside as contrary to law and beyond the lawful jurisdiction of the Commission.

STANFORD, C. J., and MORGAN, J., concur.