251 P.3d 400

Roy MILLER; Thomas F. Husband; Jennifer Bryson; and Corpus Communications, Inc., Plaintiffs/Petitioners/Appellants/Cross–Appellees,

v.

ARIZONA CORPORATION COMMISSION; and Kristin Mayes, William Mundell, Jeff Hatch–Miller, Gary Pierce, and Mike Gleason, in their official capacities as members of the Arizona Corporation Commission, Defendants/Respondents/Appellees/Cross–Appellants.

No. 1 CA–CV 09–0789.

Court of Appeals of Arizona, Division 1, Department C.

April 7, 2011.

**22**

Scharf–Norton Center for Constitutional Litigation By Clint Bolick, Carrie Ann Sitren, Phoenix, Attorneys for Plaintiffs/Petitioners/Appellants/Cross–Appellees.

Arizona Corporation Commission Legal Division By Wesley C. Van Cleve, Ayesha Vohra, Janet F. Wagner, Phoenix, Attorneys for Defendants/Respondents/Appellees/Cross–Appellants.

Arizona Center for Law in the Public Interest By Timothy M. Hogan, Joy Herr–Cardillo, Phoenix, Attorneys for Amicus Curiae.

Arizona Public Service Company By Meghan H. Grabel, Phoenix, Attorney for Amicus Curiae.

## OPINION

DOWNIE, Judge.

¶ 1 Roy Miller, Thomas Husband, Jennifer Bryson, and Corpus Communications, Inc. (collectively, "Plaintiffs") are customers of Arizona Public Service Company ("APS"). In this litigation, Plaintiffs collaterally attack the 2006 Renewable Energy Standard and Tariff ("REST") rules promulgated by the Arizona Corporation Commission ("Commission"),[1] as well as an APS surcharge imposed under those rules. In a cross-appeal, the Commission contends the superior court erred by reaching the substantive merits of Plaintiffs' claims. For the following reasons, we agree with the superior court's determination that the Commission acted within its plenary ratemaking authority under the Arizona Constitution in enacting the REST rules and approving the APS surcharge.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Over two decades ago, the Commission started to evaluate new sources of electrical generation. Since that time, the Commission has promulgated a series of rules relating to

---

1. Plaintiffs also named as defendants the then-existing members of the Corporation Commission, in their official capacities. We refer to the defendants collectively as "the Commission."

renewable energy. The 1996 Solar Portfolio Standard, for example, required that a percentage of retail electricity sold to Arizona customers by regulated utilities come from solar resources. The Commission later moved beyond solar power to consider other "environmentally friendly" resources, such as wind, landfill gas, and biomass generation. This expanded focus was reflected in the Commission's 2001 adoption of the Environmental Portfolio Standard ("EPS"), which replaced the Solar Portfolio Standard.

¶ 3 The Commission began considering amendments to the EPS in 2004, initially focusing on implementing relatively minor changes. A two-year evaluation process ensued. In a January 2006 report, Commission staff cited several reasons for more expansive changes, including reliability issues, post–9/11 security concerns, the need to diversify fuel supplies and technologies, and environmental and economic impacts.

¶ 4 In February 2006, the Commission proposed repealing the EPS and adopting the REST rules. On November 14, 2006, the Commission adopted the REST rules by majority vote. *See* Arizona Administrative Code ("A.A.C.") R14–2–1801 to –1816. The rules were certified by the Arizona Attorney General in June 2007, and they became effective August 14, 2007. On April 28, 2008, the Commission approved APS's 2008 Renewable Energy Standard Implementation Plan and rate schedule, which included à customer surcharge authorized by the REST rules.

¶ 5 Renewable energy generation projects typically are large-scale facilities that use resources such as solar, wind, geothermal, biomass, and biogas to generate electricity. Distributed energy, which we discuss *infra,* is generated by systems located at customer premises. Generally speaking, the REST rules: (1) define eligible renewable energy resources; (2) require utilities to provide an increasing percentage of retail electricity sales from renewable resources; (3) mandate that a portion of the renewable energy requirements come from distributed energy

systems; (4) create processes by which utilities set surcharges and customers seek reimbursement for renewable energy technologies; and (5) outline reporting requirements and noncompliance penalties.

¶ 6 In June 2008, Plaintiffs filed a petition for special action in the Arizona Supreme Court, challenging the Commission's authority to enact the REST rules or approve the APS surcharge. The supreme court declined jurisdiction. Plaintiffs then filed a petition for special action in this Court, which also declined jurisdiction. In November 2008, Plaintiffs filed a complaint in the Maricopa County Superior Court, seeking declaratory, injunctive, and special action relief. Plaintiffs sought to invalidate the REST rules and the APS surcharge, arguing the Commission had exceeded its authority.

¶ 7 Plaintiffs moved for summary judgment in the superior court. The Commission filed a cross-motion for summary judgment. The superior court accepted special action jurisdiction, denied Plaintiffs' motion for summary judgment, and granted the Commission's cross-motion. The court concluded that the REST rules and the APS surcharge fall within the Commission's constitutional plenary power as "reasonably necessary steps" in ratemaking. Plaintiffs timely appealed, and the Commission timely cross-appealed.[2]

### DISCUSSION

### A.  The Scope of a Collateral Attack

¶ 8 The only Commission member to vote against the REST rules nonetheless recognized that the rules had been thoroughly evaluated, stating: "The process by which the REST Rules were developed and adopted was one of the most thoroughly deliberated rulemaking dockets in the history of the Commission." The record supports this characterization.

¶ 9 Over a roughly two-year period, the Commission and its staff held numerous workshops and open meetings, presented

---

**2.** The cross-appeal challenges the superior court's consideration of the substantive merits of Plaintiffs' claims. The Commission states that we need not address the cross-appeal if we af-firm on the merits. Because we affirm the superior court's judgment, we do not reach the cross-appeal.

draft proposals, and considered public comments. Ratepayers and organizations intervened and participated in Commission proceedings. *See, e.g.,* A.A.C. R14–3–105 ("Persons, other than the original parties to the proceedings, who are directly and substantially affected by the proceedings" may participate as intervenors upon securing an order from the Commission). APS and other utilities raised concerns that were considered during the lengthy vetting process. Hundreds of individuals and entities filed public comments and sent e-mails. Plaintiffs, however, did not participate in the Commission proceedings. Plaintiffs recognize that, because they did not participate in the administrative proceedings, this legal challenge is a collateral attack on the Commission's decisions. As such, the scope of our review is relatively limited.

■ ¶ 10 Parties to an administrative proceeding may seek judicial review on significantly broader grounds than litigants who collaterally attack a final decision. An aggrieved party to the underlying Commission proceedings, for example, might argue on appeal that the Commission's decisions were not supported by substantial evidence, were arbitrary and capricious, or were legally erroneous. In a collateral attack, though, the challengers may question only the Commission's jurisdiction. The Arizona Supreme Court has discussed collateral attacks on Commission orders as follows:

> The complaint [before us] is a collateral attack upon an order of the Corporation Commission and if it had jurisdiction to set aside the order of revocation, plaintiff must fail for the reason that any order which the Commission has [the] power to make is conclusive unless the statutory procedure for review is followed. On the other hand, a decision of the Commission which goes beyond its power as prescribed by the Constitution and statutes is vulnerable for

lack of jurisdiction and may be questioned in a collateral proceeding.

*Tucson Warehouse & Transfer Co. v. Al's Transfer, Inc.,* 77 Ariz. 323, 325, 271 P.2d 477, 478 (1954) (citation omitted); *see also George v. Ariz. Corp. Comm'n,* 83 Ariz. 387, 392, 322 P.2d 369, 372 (1958) (because the Commission's action was "a bare usurpation of power … the rule prohibiting collateral attack has no application"); *State ex rel. Dandoy v. City of Phoenix,* 133 Ariz. 334, 338, 651 P.2d 862, 866 (App.1982) (distinguishing between legal error that is not subject to collateral attack and a challenge to jurisdiction).

¶ 11 Because of the procedural posture of this case, we do not consider whether the REST rules represent prudent public policy or make economic sense.[3] Nor do we address purported errors of fact or law that might have occurred at the Commission level. *See, e.g., Ariz. Pub. Serv. Co. v. S. Union Gas Co.,* 76 Ariz. 373, 381, 265 P.2d 435, 440 (1954) ("The test of jurisdiction is whether or not the tribunal has power to enter upon the inquiry; not whether its conclusion in the course of it is right or wrong." (citations omitted)). With this analytic framework in mind, we turn to Plaintiffs' contention that neither the Arizona Constitution nor state statutes give the Commission authority to enact the REST rules.[4] We review this legal claim *de novo. See U.S. W. Commc'ns, Inc. v. Ariz. Corp. Comm'n,* 197 Ariz. 16, 22, ¶ 25, 3 P.3d 936, 942 (App.1999).

## B. The Commission's Authority

■ ¶ 12 "The Arizona Corporation Commission, unlike such bodies in most states, is not a creature of the legislature, but is a constitutional body which owes its existence to provisions in the organic law of this state." *Ethington v. Wright,* 66 Ariz. 382, 389, 189 P.2d 209, 214 (1948). The Commission's authority "is limited to those powers

---

**3.** At oral argument before both the superior court and this Court, Plaintiffs acknowledged that they could challenge the wisdom of the Commission's decisions only by participating in the administrative process.

**4.** As noted, Plaintiffs also challenge the Commission's approval of APS's 2008 implementation

plan, which included a customer surcharge. Whether the Commission had the power to approve the surcharge depends largely on whether the Commission acted within its jurisdiction in promulgating the REST rules in the first instance. Accordingly, we focus primarily on that issue.

given it by the Constitution and statutes of the state." *Tucson Warehouse & Transfer,* 77 Ariz. at 326, 271 P.2d at 478. The Commission possesses judicial, executive, and legislative powers. *Ariz. Corp. Comm'n v. State ex rel. Woods,* 171 Ariz. 286, 291, 830 P.2d 807, 812 (1992). It "exercises its executive, administrative function in adopting rules and regulations, its judicial jurisdiction in adjudicating grievances, and its legislative power in ratemaking." *Id.*

¶ 13 Under Article 15, Section 3, of the Arizona Constitution, the Commission possesses plenary power to set "just and reasonable rates and charges" collected by public service corporations. Article 15, Section 3 reads:

The corporation commission shall have full power to, and shall, prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the state for service rendered therein, and make reasonable rules, regulations, and orders, by which such corporations shall be governed in the transaction of business within the state, and may prescribe the forms of contracts and the systems of keeping accounts to be used by such corporations in transacting such business, and make and enforce reasonable rules, regulations, and orders for the convenience, comfort, and safety, and the preservation of the health, of the employees and patrons of such corporations; Provided, that incorporated cities and towns may be authorized by law to exercise supervision over public service corporations doing business therein, including the regulation of rates and charges to be made and collected by such corporations; Provided further, that classifications, rates, charges, rules, regulations, orders, and forms or systems prescribed or made by said corporation commission may from time to time be amended or repealed by such commission.

¶ 14 Since 1914, the Arizona courts have frequently been asked to define the scope of the Commission's powers under Article 15, Section 3. The ensuing decisions "have not been entirely consistent in all respects, and particularly in some of the reasoning and the language used." *Corp. Comm'n v. Pac. Greyhound Lines,* 54 Ariz. 159, 176, 94 P.2d 443, 450 (1939). Some of the earliest judicial pronouncements conferred broad authority on the Commission. *See Woods,* 171 Ariz. at 292, 830 P.2d at 813 (noting that early case law "effectuated the founders' broad grant of powers to the Commission"). In *State v. Tucson Gas, Electric Light & Power Co.,* 15 Ariz. 294, 138 P. 781 (1914), for example, the court labeled the Commission's powers "extraordinary and unusual," summarizing them as follows:

The Corporation Commission, therefore, has been vested by section 3 ... with full power, with the command to exercise it: (1) To prescribe just and reasonable classifications to be used; (2) just and reasonable rates and charges to be made and collected; (3) reasonable rules, regulations, and orders by which public service corporations "shall be governed in the transaction of business within the state."

*Id.* at 304–05, 138 P. at 785(quoting Ariz. Const. art. 15, § 3). Regarding the three enumerated categories, *Tucson Gas* held that the Commission's authority is exclusive and "not to be exercised by the Legislature." *Id.* at 307, 138 P. at 786.

¶ 15 Four years later, the supreme court revisited the subject of the Commission's constitutional authority in *Arizona Eastern Railroad Co. v. State,* 19 Ariz. 409, 414–15, 171 P. 906, 908–09 (1918). The court drew a distinction between the "general powers granted imperatively in the first part of section 3," and the "permissive" authority to make and enforce reasonable rules, regulations, and orders to govern public service corporations. *Id.* In the latter context, the court held, the legislature is not precluded from acting. *Id.* at 415–16, 171 P. at 909.

¶ 16 In *Pacific Greyhound,* the court "substantially limited the Commission's power by narrowly construing article 15, section 3." *Woods,* 171 Ariz. at 292, 830 P.2d at 813. It noted the sometimes inconsistent language and reasoning of earlier cases, but concluded that the clause authorizing the Commission to "make reasonable rules, regulations and orders" merely qualifies the preceding

clause, which allows the Commission to "prescribe just and reasonable classifications to be used, and just and reasonable rates and charges to be made and collected." *Pacific Greyhound,* 54 Ariz. at 176, 94 P.2d at 450 (quoting Ariz. Const. art. 15, § 3).

¶ 17 Subsequent cases "further narrowed the Commission's regulatory authority." *Woods,* 171 Ariz. at 293, 830 P.2d at 814. In *Commercial Life Insurance Co. v. Wright,* 64 Ariz. 129, 139, 166 P.2d 943, 949 (1946), for example, the court held the Commission has "no implied powers and its powers do not exceed those to be derived from a strict construction of the Constitution and implementing statutes." Two years later, though, the court ruled that the Commission's powers are not limited to prescribing classifications and setting rates for public service corporations, but extend to "necessary step[s]" in ratemaking. *Ethington,* 66 Ariz. at 392, 189 P.2d at 216.

¶ 18 In *Woods,* the supreme court reexamined the preceding line of cases "critically in light of the history and text of the constitution." 171 Ariz. at 294, 830 P.2d at 815. *Woods* involved a challenge to rules requiring public service corporations to "report information about, and obtain permission for transactions with, its parent, subsidiary, and other affiliated corporations." *Id.* at 287, 830 P.2d at 808. In exploring the origins of and rationale for the Commission's Article 15 powers, *Woods* noted the founders' expectation that the Commission provide "both effective regulation of public service corporations and consumer protection against overreaching by those corporations." *Id.* at 290, 830 P.2d at 811. The "strongest power" the Commission derives from the Arizona Constitution is its regulation of public service corporations. *Id.*

## C. The Managerial Interference Doctrine

¶ 19 In attacking the Commission's jurisdiction, Plaintiffs rely heavily on the so-called managerial interference doctrine, arguing that the REST rules "trench deeply upon management prerogatives." Although not initially labeled as such, the origins of the managerial interference doctrine can be traced to cases such as *Corporation Commission v. Consolidated Stage Co.,* 63 Ariz. 257, 161 P.2d 110 (1945). In *Consolidated Stage,* the court held that the Commission could not require a corporation to transfer stock from one shareholder to another, stating:

[T]he commission has no authority or jurisdiction to control the internal affairs of the corporation. It cannot dictate who its officers shall be, whom it shall employ, who may invest money in it, nor what provisions it shall make for the recognition of its shareholders, nor the manner of transferring shares of stock upon its books ... Chaos would result in all corporations if the corporation commission, under the mantle of state authority, were permitted to dictate to a corporation to whom to issue and transfer its shares of stock.

*Id.* at 263, 161 P.2d at 112; *see also S. Pac. Co. v. Ariz. Corp. Comm'n,* 98 Ariz. 339, 343, 404 P.2d 692, 694 (1965) (discussing regulatory actions that "act as a barrier to the normal accomplishments of progressive management").

¶ 20 More recently, the court in *Woods* distinguished between Commission rules that "constitute an attempt to control the corporation" and rules that "attempt to control rates." 171 Ariz. at 297, 830 P.2d at 818. And in *Phelps Dodge Corp. v. Arizona Electric Power Cooperative, Inc.,* 207 Ariz. 95, 101, ¶ 2, 83 P.3d 573, 579 (App.2004), this Court examined Commission regulations establishing competition in the electric industry. We held that certain rules (e.g., those requiring utilities to establish administrators to oversee fair access to transmission services in a manner prescribed in great detail) "invade[d] the Affected Utilities' managerial prerogative to decide how best to open access to transmission and distribution facilities." *Id.* at 113, ¶ 60, 83 P.3d at 591.

¶ 21 Not surprisingly, Arizona cases applying the managerial interference doctrine have involved regulated corporations as parties.[5] No public service corporation,

5. The same is true of *Oklahoma Gas & Electric Co. v. Corporation Commission,* 543 P.2d 546, 551 (Okla.1975), a case relied on by Plaintiffs.

though, has claimed that the REST rules impermissibly interfere with its management functions or prerogatives. The record reflects that most, if not all, utilities affected by the REST rules worked with the Commission during the extended evaluation and comment period preceding the rules' adoption. APS has filed an *amicus* brief in this litigation, persuasively arguing that Plaintiffs lack standing to invoke the managerial interference doctrine. APS states:

> The Court should not entertain [Plaintiffs'] "management interference" argument for the additional reason that they lack standing to assert it. The "management interference" doctrine protects regulated companies like APS from Commission intrusion into matters rightfully within the province of company management. In this case, neither APS nor any other utility chose to pursue that claim. Instead, APS participated in the Commission's rulemaking process in an effort to harmonize its own renewable energy objectives with the REST Rules finally adopted. [Plaintiffs], who have no involvement in managing any utility, cannot be heard to complain about "management interference" in the context of this case.

¶ 22 We agree with APS. "[S]tanding to raise an appeal is not equivalent to standing to raise a particular argument on appeal." *Goglia v. Bodnar*, 156 Ariz. 12, 18, 749 P.2d 921, 927 (App.1987). "When an error applies to only one party who does not appeal, another party cannot make that argument on its own behalf." *Id.*

¶ 23 The managerial interference doctrine is a judicial construct designed to protect regulated corporations from over-reaching and micro-management of their internal affairs by the Commission. It would be anomalous, to say the least, to allow APS customers to claim interference with managerial prerogative when APS itself disavows, and even embraces, the alleged "interference" by the Commission.[6] We hold that Plaintiffs lack standing to assert the managerial interference doctrine in these proceedings.

### D. The REST Rules

¶ 24 According to the Commission, promulgation of the REST rules falls within its plenary power over ratemaking under Article 15, Section 3. Alternatively, it contends the rules are authorized by the "permissive, concurrent authority found in the second half of section 3." Because we agree with the Commission's assertion of plenary power, we need not determine whether the rules are permissible pursuant to concurrent authority with the legislature or legislative authorization.

¶ 25 The parties disagree about how to approach the rules, with Plaintiffs advocating the rule-by-rule analysis pursued in *Phelps Dodge* and *U.S. West*, and the Commission recommending the more holistic approach followed by *Woods* and the superior court below. No single proper method exists for evaluating the propriety of Commission rules. *Phelps Dodge*, 207 Ariz. at 116, ¶¶ 80–84, 83 P.3d at 594.

¶ 26 Plaintiffs' advocacy for a rule-by-rule analysis is at odds with their own briefing and argument. With two exceptions (A.A.C. R14–2–1805 and –1809), both in the superior court and on appeal, Plaintiffs have presented only generalized challenges to the REST rules. By generally asserting a lack of jurisdiction, Plaintiffs have not triggered an obligation by the Court or the Commission to embark on a rule-by-rule analysis and defense. This is especially true here, where Plaintiffs do not challenge all of the REST rules.[7] Although appellate precedent makes clear that we are not mere rubber stamps for rules promulgated under the semblance of ratemaking authority, except in narrowly prescribed contexts,[8] it is not the role of an

---

6. Indeed, APS advises that its own internal management plan calls for development of renewable energy resources in excess of the Commission's requirements.

7. Plaintiffs concede, for example, that R14–2–1808 (dealing with tariffs) constitutes ratemaking.

8. *See, e.g., Anders v. California*, 386 U.S. 738, 744, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) (establishing that, in a criminal appeal, defendants may ask the appellate court to search the record for fundamental error).

appellate court to identify and develop arguments that a party to the litigation has not made. *Cf. Ace Auto. Prod., Inc. v. Van Duyne,* 156 Ariz. 140, 143, 750 P.2d 898, 901 (App.1987).

### 1. The REST Rules Generally

■ ¶ 27 "[T]he work of fixing rates is the most complicated subject in the economic world. There are all sorts of things to be taken into consideration in fixing rates." *Woods,* 171 Ariz. at 295, 830 P.2d at 816 (quoting *Records of the Ariz. Constitutional Convention of 1910,* at 979).[9] Because ratemaking is such a complex and specialized endeavor, courts accord substantial deference to the Commission's determinations of "what regulation is reasonably necessary for effective ratemaking." *Id.* at 294, 830 P.2d at 815.

¶ 28 The Commission made extensive factual findings in adopting the REST rules. As noted *supra,* ¶ 10, the factual underpinnings for the REST rules are not subject to review in this collateral attack. Several Commission findings are germane to the question of jurisdiction, including the following:

- Arizona's electric utilities primarily maintain fossil fuel resources in their portfolios.
- Load growth (i.e., demand) in Arizona will require utilities to add new generation resources to their portfolios to provide adequate service to customers.
- The utilities' current portfolios lack "sufficient diversity to promote and safeguard the security, convenience, health and safety" of their customers and the general public.
- Renewable energy resources are not "subject to the same price fluctuations and transportation disruptions as conventional fossil fuel energy sources."
- "Continued reliance on fossil fuel generation resources without the addition of renewable generation resources is inadequate and insufficient to promote and safeguard the security, convenience, health and safety of the Affected Utilities' customers and the public in Arizona, and is therefore unjust, unreasonable, unsafe, and improper."
- "It is just, reasonable, proper, and necessary to require a diverse fuel supply for Arizona's electricity needs in order to reduce reliance on fossil fuel energy sources in Arizona to promote and safeguard the security, convenience, health and safety of the Affected Utilities' customers and the public in Arizona."

¶ 29 The Commission also had information before it reflecting that utilities relying "on a single or a few fuels for electricity generation are more vulnerable to shortages of fuel and the fluctuation of fuel prices than utilities that utilize a balanced and broadly diversified portfolio of fuel resources and generation technologies." The record additionally indicates that price fluctuations and shortages of conventional fuel supplies "can place a severe strain on a utility's financial condition and put upward pressure on electricity rates."[10] Further, the record posits that without the REST rules, utilities have "little incentive to replace natural gas costs with the cost of renewable." Requiring utilities to seek renewable energy sources was found to serve as a "hedge" against volatile fuel prices and limit "ratepayers' exposure to high natural gas prices."

■ ¶ 30 In its ratemaking capacity, the Commission looks at more than "setting a fair return on a predetermined value." *Woods,* 171 Ariz. at 296, 830 P.2d at 817. The Commission may take a "broader view" and consider, for example, risks associated with contemplated action or inaction. *See id.* (noting that inter-corporate dealings "can have disastrous consequences for the economic viability of the entire enterprise," ultimately prejudicing ratepayers). Or, as the

---

9. We recognize that much has changed in the "economic world" (and elsewhere) since the Constitutional Convention. Even assuming that ratemaking is no longer the "most complicated subject in the economic world," it remains sufficiently complex to warrant continued judicial deference.

10. The Commission noted that the effect of high fuel prices on rates was apparent when APS requested rate increases in 2007, demonstrating that "ratepayers have little insulation against the price of natural gas."

*Woods* court more colorfully put it, the Commission has "the power to lock the barn door before the horse escapes." *Id.* at 297, 830 P.2d at 818.

¶ 31 The record here establishes a sufficient nexus between the REST rules and ratemaking. Prophylactic measures designed to prevent adverse effects on ratepayers due to a failure to diversify electrical energy sources fall within the Commission's power "to lock the barn door before the horse escapes." *Id.* Indeed, as *Woods* found in the context of inter-company transactions, "[i]t would subvert the intent of the framers to limit the Commission's ratemaking powers so that it could do no more than raise utility rates to cure the damage." *Id.* at 296, 830 P.2d at 817.

¶ 32 In formulating the REST rules, the Commission considered price fluctuations, transportation disruptions, and shortages associated with conventional fuel sources, noting that renewable resources are not subject to these same vagaries. Its findings connect the identified risks to the financial stability of utilities and, therefore, to consumer electric rates. The Commission also found that Arizona's anticipated load growth requires the identification and development of new sources of electrical generation to ensure adequate service to utility customers. It concluded that diversification through the use of renewable energy is directly linked to the "security, convenience, health and safety" of utility customers and the general public.

¶ 33 The record demonstrates a relationship between the REST rules and electric rates. If anything, the ratemaking connection is stronger here than with the affiliated interest rules at issue in *Woods*. We next consider the only two rules that Plaintiffs have challenged with any degree of specificity to determine whether they somehow merit different treatment.

**2. Distributed Renewable Energy Requirement (R14–2–1805)**

¶ 34 R14–2–1805 imposes distributed renewable energy requirements. Distributed resources are those "sited at a customer premises, providing electric energy to the customer load on that site or providing wholesale capacity and energy to the local Utility Distribution Company for use by multiple customers...." A.A.C. R14–2–1801(E). Distributed resources displace conventional energy that would otherwise be required to provide electricity. A.A.C. R14–2–1802(B). They include solar technologies, geothermal resources, hydropower, and wind generation. A.A.C. R14–2–1802(B)(1)–(12). Photovoltaic systems and solar water heating are currently the most common distributed energy applications.

¶ 35 The REST rules provide financial incentives to utility customers who install distributed energy technologies. R14–2–1805, reads:

A. In order to improve system reliability, each Affected Utility shall be required to satisfy a Distributed Renewable Energy Requirement by obtaining Renewable Energy Credits [11] from Distributed Renewable Energy Resources.[12]

B. An Affected Utility's Distributed Renewable Energy Requirement shall be calculated each calendar year by applying the following applicable annual percentage to the Affected Utility's Annual Renewable Energy Requirement: [13]

| | |
|---|---|
| 2007 | 5% |
| 2008 | 10% |
| 2009 | 15% |
| 2010 | 20% |
| 2011 | 25% |
| After 2011 | 30% |

11. "Renewable Energy Credit" is defined as "the unit created to track kWh derived from an Eligible Renewable Energy Resource or kWh equivalent of Conventional Energy Resources displaced by Distributed Renewable Energy Resources." A.A.C. R14–2–1801(N).

12. "Renewable Energy Resource" is defined as "an energy resource that is replaced rapidly by a natural, ongoing process and that is not nuclear or fossil fuel." A.A.C. R14–2–1801(O).

13. "Annual Renewable Energy Requirement" is defined as "the portion of an Affected Utility's annual retail electricity sales that must come from Eligible Renewable Energy Resources." A.A.C. R14–2–1801(B).

. . . .

C. An Affected Utility may use Renewable Energy Credits acquired in any year to meet its Distributed Renewable Energy Requirement. Once a Renewable Energy Credit is used by any Affected Utility to satisfy these requirements, the credit is retired.

D. An Affected Utility shall meet one-half of its annual Distributed Renewable Energy Requirement from residential applications and the remaining one-half from non-residential, non-utility applications.

E. An Affected Utility may satisfy no more than 10 percent of its annual Distributed Renewable Energy Requirement from Renewable Energy Credits derived from distributed Renewable Energy Resources that are nonutility owned generators that sell electricity at wholesale to Affected Utilities. This Wholesale Distributed Generation Component shall qualify for the non-residential portion of the Distributed Renewable Energy Requirement.

A.A.C. R14–2–1805.

¶ 36 Plaintiffs label R14–2–1805 a "true poster-child[ ] for the degree to which the [REST] Rules control the companies rather than rates." They focus primarily on subsection (D), which they consider especially pernicious because it requires "exactly 50 percent—not 49 or 47 or 60 but exactly 50 percent—[of the renewable resources to] be derived from residential sources and the other half from commercial sources." In large part, Plaintiffs' challenge to R14–2–1805 is based on the managerial interference doctrine, which they may not invoke. However, Plaintiffs also take issue with the lack of factual findings by the Commission in support of the rule.

---

**14.** In Decision No. 70313, the Commission recognized the challenges posed by the residential distributed energy targets, stating:

The biggest problem facing the utilities in the implementation of their REST Plans is the extremely high cost of providing incentives to residential customers that are substantial enough to encourage thousands of customers to opt for renewable energy systems.

¶ 37 A lack of factual findings is not a jurisdictional defect. *See Rural/Metro Corp. v. Ariz. Corp. Comm'n*, 129 Ariz. 116, 118, 629 P.2d 83, 85 (1981) ("Jurisdiction relates solely to the competency of the particular court or administrative body to determine controversies of the general class to which the case then presented for its consideration belongs."). Moreover, the record *does* link distributed energy requirements to utility rates and to the stability of Arizona's electrical power supply. Commission reports state that distributed resources located at customer sites will: (1) decrease peak demand; (2) move the production of electricity "closer to the point of use," thereby improving efficiency of the transmission grid; and (3) "reduce the need to build new transmission to support the new generation." These factors have an obvious effect on electric rates. The Commission also observed that distributed resources reduce the risk of "losing that transmission to natural disaster or other unanticipated events."

¶ 38 It may be that a "ramp up" to the 50% requirement for residential customers was a more prudent approach, as some have suggested. Or perhaps it is simply unrealistic, given the costs, to ever expect residential customers to install distributed energy systems in sufficient quantities to justify 50% proportionality. As we have previously observed, though, neither the substantive wisdom of the rules nor the factual underpinnings for them are before us. This includes the 50/50 distributed energy split.[14] The record demonstrates that R14–2–1805 falls within the Commission's plenary power over ratemaking.

### 3. Customer Self–Directed Renewable Energy Option

¶ 39 The other rule that Plaintiffs challenge is R14–2–1809, which reads:

The Commission observed that it "may need to 'tweak' or adjust the REST process as conditions change." Additionally, utilities may seek waivers under the rules, including the distributed energy percentage requirements. *See* A.A.C. R14–2–1816.

A. By January 1, 2007, each Affected Utility shall file with Docket Control a Tariff by which an Eligible Customer may apply to an Affected Utility to receive funds to install distributed Renewable Energy Resources. The funds annually received by an Eligible Customer pursuant to this Tariff may not exceed the amount annually paid by the Eligible Customer pursuant to the Affected Utility's Tariff.

B. An Eligible Customer seeking to participate in this program shall submit to the Affected Utility a written application that describes the Renewable Energy Resources that it proposes to install and the projected cost of the project. An Eligible Customer shall provide at least half of the funding necessary to complete the project described in its application.

C. All Renewable Energy Credits derived from the project, including generation and Extra Credit Multipliers, shall be applied to satisfy the Affected Utility's Annual Renewable Energy Requirement.

A.A.C. R14–2–1809.

¶ 40 Citing *U.S. West,* Plaintiffs contend R14–2–1809 is "eerily similar to—though far more oppressive than—the equal access requirements and the collection and billing requirements this [c]ourt found '[d]o not relate at all to ratemaking.'" We disagree and observe that, in large measure, this argument also rests on the managerial interference doctrine.

¶ 41 In *U.S. West,* the court found a nexus to ratemaking for rules relating to: (1) pricing of competitive services; (2) procedures for rate changes; (3) establishment of a Universal Service Fund; and (4) procedures for classifying a competitive service. 197 Ariz. at 24, ¶ 30, 3 P.3d at 944. On the other hand, the court determined that certain rules regulating billing and collection practices did not

derive from the Commission's ratemaking powers and thus required attorney general approval. *Id.* at ¶ 32. The same was true of a provision requiring that customers have equal access to choose long distance carriers.[15] *Id.* at 25, ¶ 36, 3 P.3d at 945.

¶ 42 R14–2–1809(B) allows customers to seek reimbursement for amounts they spend to install renewable energy systems. A utility customer desiring reimbursement for self-directed renewable energy technologies must file an application describing the proposed installation and projected costs. The rule leaves it to the utilities to process such applications. R14–2–1809 is more akin to, though less onerous than, Commission regulations unsuccessfully challenged in *Phelps Dodge. See, e.g., Phelps Dodge,* 207 Ariz. at 117, ¶¶ 87 & 89, 83 P.3d at 595 (holding that rules allowing customers to select competitive services, permitting utilities to recover costs through customer charges, and requiring utilities to submit detailed reports to the Commission regarding, *inter alia,* kilowatt hours sales and revenues from sales by customer classes were reasonably necessary steps in ratemaking). R14–2–1809 was properly promulgated pursuant to the Commission's plenary power under Article 15, Section 3.

**E. APS Surcharge**

¶ 43 Plaintiffs implicitly concede that, if the Commission acted within its jurisdiction in enacting the REST rules, it possessed the necessary authority to rule on APS's surcharge requests. We agree. Approval of the surcharges at issue falls squarely within the Commission's plenary power over ratemaking.

**CONCLUSION**

¶ 44 We affirm the judgment of the superior court. Plaintiffs have not prevailed on

---

**15.** The billing and collection rules required utilities to "bill monthly for any competitive services rendered" and mandated detailed information that must appear on bills, including a description of the services provided, the monthly charge, and a toll-free number for billing inquiries. *Id.* at 33, 3 P.3d at 953, app. A.A.C. R14–2–1114(D). The equal access provision required utilities to provide "2–PIC toll equal access where technically and economically feasible," as well as a "sequence for implementation of intraLATA equal access." *Id.* at 32, 3 P.3d at 952, app. A.A.C. R14–2–1111.

appeal, and we therefore deny their request for an award of attorneys' fees.

CONCURRING: MAURICE PORTLEY, Presiding Judge and PATRICIA A. OROZCO, Judge.