IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

JOHNSON UTILITIES, L.L.C., AN ARIZONA LIMITED LIABILITY COMPANY,
*Petitioner*,

*V.*

ARIZONA CORPORATION COMMISSION; TOM FORESE, BOB BURNS, ANDY
TOBIN, BOYD W. DUNN AND JUSTIN OLSON, IN THEIR OFFICIAL CAPACITIES
AS MEMBERS OF THE ARIZONA CORPORATION COMMISSION
*Respondents*.

No. CV-19-0105-PR
Filed July 31, 2020

Arizona Corporation Commission
No. WS-02987A-18-0050
The Hon. Sarah N. Harping, Administrative Law Judge
**AFFIRMED**

Opinion of the Court of Appeals, Division One
246 Ariz. 287 (App. 2019)
**VACATED**

COUNSEL:

Daniel E. Fredenberg, Christian C.M. Beams, Fredric D. Bellamy, (argued)
Fredenberg Beams LLC, Phoenix; Jeffrey W. Crockett, Crockett Law Group
PLLC, Phoenix, Attorneys for Johnson Utilities, L.L.C.

Robin R. Mitchell (argued), Naomi E. Davis, Maureen A. Scott, Wesley C.
Van Cleve, Phoenix, Attorneys for Arizona Corporation Commission

Jason D. Gellman, EPCOR Water Arizona, Inc.; and Michael T. Hallam,
Lewis Roca Rothgerber Christie LLP, Phoenix, Attorneys for Amicus Curiae
EPCOR Water Arizona Inc.

Michele L. Van Quathem, Law Offices of Michele Van Quathem PLLC, Phoenix, Attorney for Amicus Curiae Home Builders Association of Central Arizona and Southern Arizona Home Builders Association

Meghan H. Grabel, Osborn Maledon, P.A., Phoenix, Attorneys for Amicus Curiae Arizona Water Company

Evan Bolick, Jonathan Udell, and Court S. Rich, Rose Law Group, PC, Scottsdale, Attorneys for Amicus Curiae Trilogy Encanterra Construction, LLC

Scott S. Wakefield, Hienton & Curry P.L.L.C., and Daniel Pozefsky, Residential Utility Consumer Office, Phoenix, Attorneys for Amicus Curiae Residential Utility Consumer Office

Mark Brnovich, Arizona Attorney General, Jeffrey Cantrell, Assistant Attorney General, Phoenix, Attorneys for Amicus Curiae Arizona Department of Environmental Quality

Kent Volkmer, Pinal County Attorney, Kevin Costello, Deputy County Attorney, Florence, Attorneys for Amicus Curiae Pinal County

Kevin Nguyen, Struck Love Bojanowski & Acedo, PLC, Chandler, Attorney for Amicus Curiae National Association of Water Companies

––––––––––––––

JUSTICE GOULD authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER and JUSTICES LOPEZ, MONTGOMERY and PELANDER (RETIRED)* joined. JUSTICE BOLICK concurred in part and dissented in part.

––––––––––––––

JUSTICE GOULD, opinion of the Court:

¶1        The Arizona Corporation Commission ("Commission") has permissive authority under article 15, section 3 of the Arizona Constitution to "make and enforce reasonable . . . orders for the convenience, comfort, [ ]

––––––––––––––––––––

* Justice James P. Beene has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, Justice John Pelander (RETIRED), was designated to sit in this matter.

2

safety, and . . . health" of the public at-large. We hold that this authority permits the Commission to appoint an interim manager to operate a public service corporation ("PSC") for the purpose of remedying unsafe and inadequate facilities, services, and equipment posing a health and safety risk to its customers, employees, and the public.

¶2 As the parties conceded at oral argument, the sole issue before this Court is whether the Commission has authority to appoint an interim manager for a PSC. We therefore do not address whether the Commission's order appointing an interim manager for Johnson Utilities, LLC ("Johnson") was supported by the evidence or was a reasonable remedy in this case. Thus, to the extent Johnson has preserved its right to appeal the action under A.R.S. § 40-254, the factual findings and reasonableness of that Order may be subject to review in superior court.

## I.

¶3 Johnson is an Arizona PSC that provides water and wastewater utility services in Pinal County pursuant to a Certificate of Convenience & Necessity ("CC&N") issued by the Commission. In February 2018, the Commission opened an investigation involving Johnson after receiving numerous complaints from its customers during a public comment session. The investigation ultimately resulted in a lengthy evidentiary hearing regarding Johnson's financial management, as well as the safety and adequacy of its services, equipment, and facilities.

¶4 On July 24, 2018, the Commission issued Decision Order No. 76785 ("Order"). The Order included findings that Johnson had engaged in deficient billing practices and financial mismanagement. However, the primary focus of the Commission's findings was that it had failed to provide service, equipment, and facilities that sufficiently protected "the safety, health, comfort, and convenience of its patrons, employees, and the public." In making this finding, the Order documented Johnson's prior history of alleged health and safety violations, including seventy-eight raw sewage overflows between 2010–2018.

¶5 Concluding that it was necessary to protect public health and safety, the Commission's Order appointed EPCOR Water Arizona as an "interim," or temporary, manager to conduct Johnson's "business and affairs." The Order preserved Johnson's right of ownership and stated that either Johnson or EPCOR could seek to terminate the appointment upon a showing that Johnson's services "are in all respects just, reasonable,

safe, proper, adequate, and sufficient."

¶6         The Commission and EPCOR entered an Interim Manager Agreement on August 15, 2018. Under the Agreement, EPCOR temporarily assumed management of Johnson, including control over payments made by Johnson's customers. Further, the Agreement requires EPCOR to report solely to the Commission, and not Johnson.

¶7         After pursuing several unsuccessful lawsuits challenging the Order, Johnson filed a special action in the court of appeals seeking to enjoin its enforcement. The court of appeals accepted jurisdiction but denied relief, holding that the Commission has both constitutional and statutory authority to appoint an interim manager of a PSC. *Johnson Utils. L.L.C. v. Ariz. Corp. Comm'n*, 246 Ariz. 287, 288 ¶ 2, 294 ¶ 24 (App. 2019). The court stated that the Commission's constitutional ratemaking powers under article 15, section 3 authorize it to appoint an interim manager. *Id*. at 292 ¶ 17. Additionally, the court stated that pursuant to A.R.S. § 40-321(A), the legislature had delegated such authority to the Commission. *Id*. at 293 ¶¶ 20-21.

¶8         We granted review because this case involves constitutional and statutory issues of statewide importance. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## II.

¶9         Johnson argues that the Order exceeds the Commission's constitutional ratemaking authority. Johnson also asserts that the legislature has not delegated authority to the Commission to appoint an interim manager, and that only the superior court has been granted such power. Finally, Johnson argues that the Order violates the managerial interference doctrine because it impermissibly allows the Commission to control Johnson's internal affairs.

¶10        The Commission argues that its constitutional ratemaking power authorizes it to appoint an interim manager whenever a PSC's inadequate services and operations might impact its rates. The Commission also asserts that it has "permissive authority" to appoint an interim manager under article 15, section 3 of the constitution. Finally, the Commission claims that the legislature, pursuant to § 40-321(A), has delegated such power to the Commission.

4

**¶11**    We review the interpretation of constitutional and statutory provisions de novo. *City of Surprise v. Ariz. Corp. Comm'n*, 246 Ariz. 206, 210 ¶ 10 (2019) (statutory interpretation); *Gallardo v. State,* 236 Ariz. 84, 87 ¶ 8 (2014) (constitutional questions).    In construing the Commission's authority, we apply the principle that the Commission "has no implied powers and its powers do not exceed those to be derived from a strict construction of the [c]onstitution and implementing statutes." *City of Surprise*, 246 Ariz. at 212 ¶ 20 quoting *Commercial Life Ins. Co., v. Wright*, 64 Ariz. 129, 139 (1946).

**¶12**    For the reasons discussed below, we conclude that based on the text and purpose of article 15, section 3, together with cases interpreting that provision, the Commission possesses authority to appoint an interim manager to protect the health and safety of a PSC's customers, employees, and the public at-large.    In reaching this holding, we recognize that there has been some inconsistency and confusion in our jurisprudence regarding the Commission's authority under article 15, section 3.    As a result, we endeavor here to clarify this jurisprudence, as well as explain the extent and limits of the Commission's permissive authority under section 3, by reviewing the creation of the provision and this Court's prior interpretations of it.

### III.
### A.

**¶13**    One of the primary concerns of the delegates attending the Arizona Constitutional Convention of 1910 was to protect the public from corporate abuses that had occurred in Arizona during the late nineteenth and early twentieth centuries. *See* John S. Goff, *The Records of the Arizona Constitutional Convention of 1910*, 718–22, 971–75 (December 17, 1991); Terence W. Thompson, 6 Arizona Practice Series, Corporate Practice § 1.7, Constitutional Convention.    In the years leading up to the Convention, Arizona had been the subject of "stock swindles involving mining, telephone, wireless, and other industrial corporations."  Thompson, *supra* at § 1.7 (internal quotations marks omitted).    Thus, two important political forces at the time, progressives and labor, "were firmly united on the need to provide ample authority to regulate corporations."  John D. Leshy, *The Making of the Arizona Constitution*, 20 Ariz. St. L.J. 1, 88 (1988). Consistent with this purpose, the progressive delegates repeatedly expressed their desire to protect the public from corporate abuses and overreaching. *See* Goff, *supra* at 971-976.

¶14 The Convention delegates, however, "were not content simply to give the legislature power to regulate corporate activities." Leshy, *supra* at 88. Instead, they envisioned an elected Corporation Commission "vested with broad powers to regulate the activities of [PSC]s." *Id*. (internal quotation marks omitted); *see* Gordon Morris Bakken, *The Arizona Constitutional Convention of 1910*, 1978 Ariz. St. L.J. 1, 14–15 (1978) (noting that "the progressives sought a powerful [C]ommission for the regulation of all corporations"). For example, delegate J. E. Crutchfield asserted that corporations should be subject to "honest scrutiny by a [C]orporation [C]ommission" to clear Arizona's reputation from the taint of "these corporations that have robbed the people of Arizona and enriched themselves and in some instances made this state a laughing stock in the eyes of the world." Goff, *supra* at 974.

¶15 One area of concern among the delegates was dissatisfaction with legislative control over the rates charged by railroads and other PSCs. Thompson, *supra* at § 1.7. As one delegate noted, "the work of fixing rates is the most complicated subject in the economic world." Goff, *supra* at 979. Four years after the Convention, the Arizona Supreme Court issued its first decision interpreting the authority of the Commission in *State v. Tucson Gas, Elec. Light & Power Co.*, 15 Ariz. 294 (1914). Writing for the majority, Justice Ross, who had also served as a delegate to the Convention, stated:

> there has long existed a deep-rooted dissatisfaction with the results obtained through the Legislatures . . . to adjust and regulate rates and classifications between the general public and public service corporations . . . . the lack of full information on the part of the legislator, and inadequacy of time and means of investigation, have tended to foster litigation, with the result of suspending and often of defeating the object . . . [of] secur[ing] just and reasonable classifications, rates, charges, and regulations.

*Id*. at 305-06. Justice Ross further stated that:

> [a]ll persons agree that the capital invested in public service [corporations] should receive reasonable remuneration, and that the services rendered should be efficient and practicable and to all patrons upon equal terms and conditions. With a full knowledge that these things had not been accomplished under the laws heretofore existing in this and other jurisdictions, the people in their fundamental law created the Corporation Commission, and clothed it with full power to

investigate, hear, and determine disputes and controversies between public utility companies and the general public. This was done primarily for the interest of the consumer.

*Id.*

**¶16**        However, despite the progressives' desire for expansive regulation, "[t]he great majority of the Arizona framers were themselves small businessmen and entrepreneurs," and "[n]ot surprisingly, they admired local entrepreneurship and small businesses." Leshy, *supra* at 90. Thus, the moderate delegates opposed the more extreme proposals of the progressives as "ruinous to the industrial prosperity of Arizona," and "likely to put every small corporation in Arizona out of business." Bakken, *supra* at 15. For example, when one progressive delegate proposed making "shareholders personally liable for corporate debts," the proposal "was defeated after newspapers suggested it would destroy any incentive for outsiders to invest in Arizona business." Leshy, *supra* at 90.

**¶17**        As a result, the "constitution which ultimately emerged from the convention was tempered by compromise." Bakken, *supra* at 26. Indeed, "[t]he scope of the powers ultimately given the [Corporation] [C]ommission was not nearly so great as that originally envisaged by the progressives." *Id.* at 15. Perhaps the biggest compromise occurred when, contrary to the wishes of the progressives, the framers limited the Commission's "jurisdiction to public service [corporations] as opposed to all private corporations." Leshy, *supra* at 90 (internal quotation marks omitted).

B.

**¶18**        Article 15 of the constitution creates the Commission and grants it broad authority to regulate PSCs. Ariz. Const. art. 15, § 1; *id.* § 2 (defining PSCs). The Commission's powers are set forth primarily in the following two clauses of article 15, section 3 of the Arizona Constitution:

> The [C]orporation [C]ommission *shall* have full power to, and *shall*, prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the state for service rendered therein, and make reasonable rules, regulations, and orders, by which such corporations shall be governed in the transaction of business within the state, and

*may* prescribe the forms of contracts and the systems of keeping accounts to be used by such corporations in transacting such business, and make and enforce reasonable rules, regulations, and orders for the convenience, comfort, and safety, and the preservation of the health, of the employees and patrons of such corporations . . . . (emphasis added).

**¶19**      The first clause of section 3, which describes the Commission's authority to "prescribe just and reasonable classifications . . . rates and charges" for PSCs, is referred to as the Commission's "ratemaking authority." The second clause describes the Commission's power to regulate PSCs to protect the health, safety, comfort, and convenience of their customers, employees, and the public, and is referred to as the Commission's "permissive authority."

**¶20**      In addition to the powers enumerated in section 3, the Commission is granted authority to inspect and investigate records for publicly traded corporations and PSCs (art. 15, § 4), issue certificates of incorporation and licenses (art. 15, § 5), require reports from publicly traded corporations and PSCs (art. 15, § 13), ascertain fair property values for PSCs (art. 15, § 14) and impose fines for violations of Commission rules, regulations, and orders (art. 15, §§ 16, 19).

1.

**¶21**      The Commission's ratemaking authority under article 15, section 3 is plenary. The ratemaking clause states that the Commission has "*full power*" to prescribe rules, regulations, and orders governing PSC rates, charges, and classifications. (Emphasis added.) *See Tucson Gas*, 15 Ariz. at 297 (holding that the ratemaking clause, by its terms, provides the Commission with "complete and perfect or plenary power" over ratemaking); *Ariz. E. R.R. Co. v. State*, 19 Ariz. 409, 413–14 (1918) ((hereinafter *Eastern Railroad)* stating that "[t]o prescribe classifications, rates, and charges of [PSCs] is the duty, and the exclusive duty, of the Corporation Commission").

**¶22**      The Commission's ratemaking authority is also self-executing. Specifically, because section 3 grants the Commission authority to make rules, regulations and orders, no legislative action is necessary to enable the Commission to exercise its ratemaking powers. *Miller v. Wilson*, 59 Ariz. 403, 408 (1942) (stating that in "determining whether a

constitutional provision is self-executing," courts examine whether the provision "merely lays down general principles" or "grants a right which can be put into operation without further legislative action" ); *see also Phelps Dodge Corp. v. Ariz. Elec. Power Co-op, Inc.*, 207 Ariz. 95, 110 ¶ 47 (App. 2004) (holding that the Commission's authority under article 15, section 14 to determine the fair value of PSCs is self-executing because this provision expressly grants the Commission power to determine fair value in setting rates).

¶23        Finally, the Arizona Constitution, by its terms, makes ratemaking the exclusive responsibility of the Commission; it cannot delegate this authority to another agency or branch of government. *See* Jim Rossi, *The Brave New Path of Energy Federalism*, 95 Tex. L. Rev. 399, 404 n.24 (2016) (discussing the distinction between plenary and exclusive powers); *see also Cal. Bankers Ass'n. v. Shultz*, 416 U.S. 21, 59 (1974) (stating that Congress' plenary power to regulate foreign commerce may be delegated). Specifically, the first clause of section 3 states that the Commission "*shall* have full power to, and *shall*, prescribe" rates, charges, and classifications for PSCs. Ariz. Const. 15 § 3. (emphasis added). The drafters stressed the mandatory nature of the term "shall" in the ratemaking clause by using the permissive term "may" in the second clause of section 3 to describe the Commission's authority over public health and safety. *See Members of Bd. Of Educ. of Pearce Union High Sch. Dist. v. Leslie*, 112 Ariz. 463, 465 (1975) (stating that when "may" follows "shall" in the same provision, a court presumes that the drafters intended different meanings for different terms; as a result, "shall" is given its ordinary permissive construction, and "may" is construed as directory); *see also Gutierrez v. Indus. Comm'n*, 226 Ariz. 395, 398 ¶ 12 (2011) (to same effect).

¶24        The only instance in which the legislature may divest the Commission of its exclusive ratemaking authority is with respect to "incorporated cities and towns." Ariz. Const. art. 15, § 3; *see Tucson Gas*, 15 Ariz. at 298 (stating that under section 3 the legislature is "definitely limited and restricted" to authorizing municipalities to engage in ratemaking, and that "in no other instance" is it permitted to interfere with the Commission's exclusive ratemaking authority); *see also City of Surprise*, 246 Ariz. at 211 ¶ 16 (disapproving of the Commission's efforts to create a veto over municipal acquisition of utilities as a result "at odds with our constitution's clear exclusion of municipalities from Commission regulation").

¶25        Because the Commission's ratemaking authority is plenary and (except as to towns and cities) exclusive, the legislature has no power

to enact statutes prescribing rates and charges, nor may it regulate the timing, procedure, or methods the Commission uses in calculating rates. *Tucson Gas*, 15 Ariz. at 298; *Ethington v. Wright,* 66 Ariz. 382, 394-95 (1948). And, although the Commission's ratemaking decisions are subject to judicial review, such review is limited to whether its determinations are arbitrary, unlawful, or "supported by substantial evidence." *Simms v. Round Valley Light & Power Co.*, 80 Ariz. 145, 154 (1956); Ariz. Const. art. 15, § 17 (stating that Commission orders may be appealed to state courts); *see also Ethington,* 66 Ariz. at 394 (stating the Commission's ratemaking decisions are subject to judicial review).

2.

**¶26** As noted above, the Commission's authority under the second clause of section 3 is permissive, not mandatory. *Supra* ¶ 23; *see Eastern Railroad*, 19 Ariz. at 413 (holding that the second clause of section 3 is "permissive and discretionary"). Under the permissive clause, the Commission has authority to regulate PSCs to preserve and protect public health, safety, convenience, and comfort. Ariz. Const. art. 15, § 3; *Ariz. Corp. Comm'n v. Palm Springs Utility Co.*, 24 Ariz. App. 124 (1975) (stating that "the regulatory powers of the Commission" under the permissive clause "are not limited to making orders respecting the health and safety, but also include the power to make orders respecting comfort, convenience, adequacy[,] and reasonableness of service."); *see also Pac. Gas & Elec. Co. v. State*, 23 Ariz. 81, 84–85 (1921) (holding that the permissive clause of section 3 grants the Commission authority to protect public health and safety). The Commission's permissive authority, like its ratemaking authority, is self-executing. *See Eastern Railroad*, 19 Ariz. at 414–15 (stating that under the "permissive" clause of section 3, the Commission has the authority to "make and enforce reasonable rules, regulations, and orders for the convenience, comfort, and safety, and the preservation of the health of employees and patrons of public service corporations"); *Pacific Gas*, 23 Ariz. at 84 (same); *Palm Springs*, 24 Ariz. App. at 127–28 (same).

**¶27** The Commission's permissive authority is distinct from, and unrelated to, its ratemaking powers. *See Eastern Railroad*, 19 Ariz. at 414–15 (stating that the words used to describe the Commission's permissive and ratemaking authority do not have "the same meaning and purpose," and, therefore, these "two grants of power not only admit of but demand two separate senses"). For example, it is not plenary. In contrast to the ratemaking clause, which specifically grants the Commission "full power" to prescribe classifications, rates, and charges, such language is lacking in

the permissive clause. Rather, section 3 simply states that the Commission "may" make rules, regulations, and orders to protect public health and safety. Ariz. Const, art. 15, § 3.

¶28    The Commission's permissive authority is also not exclusive. The permissive clause does not, either expressly or impliedly, limit or divest the legislature of its police power to protect the health, safety, and welfare of the public. *See State v. Beadle*, 84 Ariz. 217, 221–22 (1958) (stating the legislature has the police power over "public health, safety[,] or welfare"); *Lincoln v. Holt*, 215 Ariz. 21, 28 ¶ 25 (App. 2007) (same). Thus, the Commission exercises its permissive authority concurrently with the legislature. *See Pacific Gas*, 23 Ariz. at 84 (stating that concurrently with the Commission, the legislature may also exercise the "police power of the state for the safety, comfort, convenience, and health" of PSC employees); *Corp. Comm'n v. Pac. Greyhound Lines*, 54 Ariz. 159, 176–77 (1939) (stating that the "legislature retains power to govern [PSCs] in matters unrelated to [the Commission's] ratemaking authority"); *Phelps Dodge Corp.*, 207 Ariz. at 111 ¶ 5.

¶29    In addition to its section 3 permissive authority, the Commission also shares other non-ratemaking powers under article 15 concurrently with the legislature. Specifically, several provisions in article 15 state that the Commission's authority over PSCs is "subject to law," or "as may be prescribed by law," meaning that the Commission's authority is subject to statutes enacted by the legislature. *See Shute v. Frohmiller*, 53 Ariz. 483, 488–90 (1939) (stating that when the Arizona Constitution states the duties of the attorney general "shall be 'as prescribed by law' it . . . clearly makes it the duty of the legislature to say what they shall be"), *overruled on other grounds*, *Hudson v. Kelly*, 76 Ariz. 255 (1953); *see also State ex rel. Conway v. Superior Court*, 60 Ariz. 69, 75–76 (1942) (to the same effect) *overruled on other grounds by Adams v. Bolin*, 74 Ariz. 269 (1952). Thus, for example, section 13 provides that PSCs and publicly traded corporations "shall" make reports to the Commission "and provide such information concerning their acts and operations *as may be required by law, or by the [C]orporation [C]ommission*." (Emphasis added). *See* Ariz. Const. art. 15, §§ 8, 9 (granting the Commission authority to regulate transportation and transmission of messages between common carriers and "connecting carriers" "as shall be prescribed by the [C]orporation [C]ommission, or by law"); *see also* art. 15, § 5 (stating that the Commission has the power to issue certificates of incorporation and licenses, "as may be prescribed by law"); art 15, § 10 (stating that railroads and railways, as common carriers, are PSCs "subject to control by law").

¶**30**      However, when there is a conflict between a Commission regulation and a statute, the legislature's police authority is "paramount," meaning it has the authority to override the regulations of the Commission. *Pacific Greyhound*, 54 Ariz. at 176–77 (stating that apart from the Commission's ratemaking authority, "under the direct language of the constitution and the police power inherent in the legislative authority, the paramount power to make all rules and regulations governing PSCs not specifically and expressly given to the[C]ommission by some provision of the constitution, rests in the legislature"); *see* Ariz. Const. art. 14, § 2 (stating that all corporations doing business in Arizona may "be regulated, limited, and restrained by law"); *see also State v. Harold*, 74 Ariz. 210, 215–16 (1952) (holding that the legislature has a duty to exercise its police power to enact laws "reasonably necessary for the preservation of the public health, safety, morals, or general welfare of the public").

3.

¶**31**      Under article 15, section 6 of the Arizona Constitution, the legislature may "enlarge" the powers of the Commission by delegating additional powers to the Commission of the same "class" as those already granted by the constitution. *Compare Menderson v. City of Phoenix*, 51 Ariz. 280, 285, 290–91 (1938) (holding that the legislature could not enlarge the Commission's ratemaking authority to include a municipal transportation carrier because section 3 "does not directly, nor by implication" grant the Commission such authority "over transportation lines owned and operated by municipalities"), *with Tonto Creek Estates Homeowners Ass'n v. Ariz. Corp. Comm'n*, 177 Ariz. 49, 55–56 (App. 1993) (holding that because article 15 grants the Commission authority to regulate PSCs, the legislature may "enlarge" its powers by delegating authority to issue CC&Ns to such corporations).

¶**32**      Although section 6 permits the legislature to enlarge the powers of the Commission, the legislature lacks the power to decrease the Commission's constitutional authority over PSCs. *See Selective Life Ins. v. Equitable Life Assurance Soc. of U.S.*, 101 Ariz. 594, 600 (1967) (stating that "[t]he Arizona Constitution has entrusted the [C]orporation [C]ommission with a certain minimum of power, and the legislature may not detract from this power by placing it in itself . . . [or] by removing the [C]ommission's control over an agency exercising a substantial part of that power"). Additionally, section 6 provides that in the absence of legislative action, the Commission's rules and regulations govern.

C.

¶33        Since the adoption of the Arizona Constitution, few cases have addressed the Commission's permissive authority under section 3. Instead, most of our cases have dealt with the Commission's ratemaking powers.   Unfortunately, the ratemaking cases have been, at times, inconsistent and confusing.

¶34        In the decade following the adoption of the constitution, this Court issued three opinions interpreting the limits and extent of the Commission's powers under section 3. The first case, *Tucson Gas*, addressed the Commission's ratemaking authority.  There, a PSC was prosecuted for violating a state law prohibiting PSCs from charging customers a "minimum rate" for utility services (the PSC charged the customer "$1 for illuminating gas for lighting purposes, whereas the gas actually furnished him was of the value of 40 cents"). *Tucson Gas*, 15 Ariz. at 295.  The PSC successfully moved to dismiss the charges on the ground that only the Commission had the constitutional authority to enact laws regarding rates for utility services. *Id*. at 296.

¶35        This Court affirmed, holding that because the Commission's ratemaking authority under section 3 is plenary and exclusive, the legislature had no authority to prescribe service rates for the PSC. *Id*. at 297–99, 308.   Unfortunately, the Court incorrectly implied that the constitution grants the Commission plenary, exclusive powers over PSCs outside ratemaking.  For example, the Court stated that "[i]t was clearly the policy of the framers of the Constitution, and the people in adopting it, to take the powers of supervision, regulation, and control of public *utilities from the legislative branch and vest them in the Corporation Commission*." *Id*. at 302 (emphasis added).  The Court also stated that the Arizona Constitution granted the Commission "extraordinary and unusual" authority to make "reasonable rules, regulations, and orders by which [PSCs] *shall be governed in the transaction of business within the state*." *Tucson Gas*, 15 Ariz. at 304–05 (internal quotation marks omitted).

¶36        However, as the Court confirmed a few years later, *Tucson Gas* is a "rate case," and its holding is limited to the Commission's ratemaking authority. *Pacific Gas*, 23 Ariz. at 84.  Indeed, *Tucson Gas* expressly held:

> [w]e are of the opinion that the people, by their Constitution,
> have said, in plain and unequivocal language, that the

Corporation Commission shall have full power to, and shall, *prescribe just and reasonable classifications* to be used, and *just and reasonable rates and charges* to be collected, by [PSCs] . . . and that the power therein granted to the Commission is exclusive, and not to be exercised by the Legislature."

*Tucson Gas*, 115 Ariz. at 307 (emphasis added) (internal quotation marks omitted).

¶37        *Eastern Railroad* was the first case to analyze the Commission's permissive authority under section 3. In that case, the legislature had enacted a law limiting the maximum number of cars on a train to seventy. 19 Ariz. at 410. When the state brought an action against a railroad company for exceeding the statutory limit, the company argued that the statute was unconstitutional because it violated the Commission's exclusive, plenary authority to regulate PSCs (railroads, as common carriers, are PSCs under article 15, section 2). *Id*. The superior court granted judgment in favor of the state and the Commission appealed. *Id*.

¶38        This Court held that the statute was constitutional. In reaching this holding, the Court stated that the statute regulated public safety, an area where, unlike ratemaking, both the Commission and the legislature exercised authority. *Id*. at 415–16. The Court noted that the Commission's "permissive" authority to regulate public health and safety under section 3, as well as its authority to regulate common carriers under section 10, did not divest the legislature of its police power to protect public health and safety. *Id*. at 413, 415–16; *see Pacific Gas*, 23 Ariz. at 84 (stating that *Eastern Railroad* "involved the power of the Legislature to regulate the number of cars in a train[] and was clearly the exercise of the police power of the state for the safety, comfort, convenience, and health of employees of railroad companies").

¶39        The Court examined the Commission's permissive authority again a few years later in *Pacific Gas*. There, the Commission issued an order "regulating the placing, construction, and maintenance of telephone, telegraph, signal, trolley, electric light and power lines within the state." 23 Ariz. at 81. A few months later, the voters approved an initiative measure (including criminal penalties) "regulating the placing, erection[,] and maintenance of electric poles, wires, cables[,] and appliances." *Id*. The state filed criminal charges against Pacific Gas for violating the initiative measure. *Id*. at 82. Although it was undisputed that the company had

complied with the Commission's regulations, the state alleged it did not comply with the initiative measure. *Id*. at 82–83. Pacific Gas sought to dismiss the charges on the ground "the power and authority to regulate the placing, erecting, and maintaining of electric poles, wires, cables, and appliances was vested by section 3, article 15, of the state Constitution in the Corporation Commission exclusively," and, therefore, "the initiative measure was unconstitutional and void." *Id*. at 85.

**¶40**    The Court held that "[i]n the present case both the Commission and the Legislature have acted covering the same ground," and that both had authority to regulate in the subject area. *Id*. at 85. Citing *Tucson Gas*, the Court stated that the "power to fix rates to be charged for gas by public utilities [is] exclusively vested" in the Commission. *Id*. at 84. The Court further stated, however, that "both the Corporation Commission and the Legislature could lawfully and constitutionally, in the exercise of the police power of the state, provide for the protection and safety of the employees of public service corporations." *Id*. at 84–85.

**¶41**    Ultimately, the Court, applying a strained and confusing analysis, incorrectly held that the Commission regulations overrode state law. Specifically, it stated that the "people," as the "principal," had adopted the Constitution authorizing its "agent," the Commission, to regulate PSCs, and therefore the Commission was "bound" to issue its order enacting the subject regulations. *Id*. at 85–86. Additionally, the Court reasoned that since Pacific Gas was operating under a valid order from the Commission before enactment of the initiative measure, the charges should be dismissed. *Id*. at 86.

**¶42**    Following *Pacific Gas*, this Court's jurisprudence focused almost exclusively on the Commission's ratemaking authority. For example, in *Pacific Greyhound*, we determined that because a statute limiting the Commission's authority to issue a CC&N was unrelated to its ratemaking authority, it was constitutional. 54 Ariz. at 170–71, 176–77. In reaching this holding, the Court recognized that the Commission has constitutional powers unrelated to its ratemaking authority, and that these powers are subject to the legislature's "police power." *Id*. at 169–70, 176–77. At bottom, however, *Greyhound's* holding is limited to the Commission's ratemaking authority; the Court never addressed the Commission's permissive authority under section 3. *See Id*. at 167–69.

**¶43**    In *Ethington,* the Court examined a statute specifying the timing and methods the Commission used for ascertaining the fair market

value of PSCs. 66 Ariz. at 392–94. The Court stated that article 15, section 14 of the Arizona Constitution requires the Commission to determine fair value as "a necessary step in prescribing just and reasonable classifications, rates, and charges." *Id*. at 392, 395. Thus, the Court concluded, any statute that interferes with the Commission's duty under section 14 necessarily interferes with its plenary, exclusive ratemaking authority under section 3. *Id*. at 392, 395.

¶44 Next, in *Simms,* a PSC challenged the Commission's formula for calculating fair value. 80 Ariz. at 147–49. The Court held, however, that "our constitution does not establish a formula for arriving at fair value," and that the Commission has a "range of legislative discretion" regarding the method it uses to calculate it. *Id*. at 151, 154; *see Ariz. Corp. Comm'n v. Ariz. Pub Serv. Co.*, 113 Ariz. 368, 370–71 (1976) (stating that *Simms* stands for the proposition that "[t]he determination of the formula to be used by the Commission falls within their legislative function").

¶45 Our precedents regarding the Commission's ratemaking authority remained essentially unchanged until *Arizona Corporation Commission v. State ex rel. Woods*, 171 Ariz. 286 (1992). In *Woods*, the Court addressed rules promulgated by the Commission in response to PSCs forming holding companies. *Id*. at 289-90. Concerned that PSCs could use holding companies to weaken and bypass "its regulatory authority," the Commission proposed rules requiring PSCs to "report information about, and obtain permission for transactions with, its parent, subsidiary, and other affiliated corporations." *Id*. at 287, 288–90 (citation omitted). The attorney general, however, refused to certify the proposed rules on the ground they exceeded the Commission's ratemaking authority. *Id*. at 288–89. As a result, the Commission filed a special action challenging the attorney general's refusal. *Id*.

¶46 *Woods* held that the Commission, under its ratemaking authority, had the power to enact the proposed rules. *Id*. at 299. The Court concluded that the Commission's ratemaking authority was not strictly limited to calculating fair value and setting just and reasonable rates. *Id*. at 295. Rather, it held that:

> [g]iven the framers' intent, historical background, and precedent, we believe the Commission's regulatory power permits it to require information regarding, *and* approval of, all transactions between a public service corporation and its

affiliates that may significantly affect economic stability and thus impact the rates charged by a public service corporation.

*Id*.

¶47        The Court further stated that "in light of modern corporate practices and regulatory realism," to fulfill its purpose of protecting the public from corporate abuses, the Commission "must have the power to obtain information about, and take action to prevent, *unwise management or even mismanagement* and to forestall its consequences in intercompany transactions significantly affecting a [PSC's] structure or capitalization." *Id*. at 296-97 (emphasis added).

¶48        *Woods'* holding is flawed because it is based on the mistaken view that *Pacific Greyhound* limited the Commission's regulatory powers under section 3 to its ratemaking authority.  Specifically, the Court stated that "we measure the Commission's regulatory power by the doctrine apparently established by *Pacific Greyhound* and its progeny—that the Commission has no regulatory authority under article 15, section 3 except that connected to its ratemaking power." *Id*. at 294.  According to *Woods*, it was bound by this purported "doctrine" because it "has been precedent for over fifty years." *Id*. at 293, 294.  But, as noted above, *Pacific Greyhound* never addressed the Commission's permissive authority under section 3. *Supra* ¶42. Indeed, *Woods* itself observed that *Pacific Greyhound* "apparently ignored language in [ ] *Eastern Railroad* that at least implied that the Commission and legislature have *concurrent* power to regulate beyond the scope of classifications, rates, and charges." *Id*. at 293 n.6.

¶49        Rather than overruling *Pacific Greyhound*, *Woods* instead expanded the Commission's ratemaking authority to permit promulgation of the proposed rules by emphasizing the framers' intent to create a strong Commission to protect the public from corporate abuse. *Id*. at 293. Thus, *Woods* concluded, "[i]t would subvert the intent of the framers to limit the Commission's ratemaking powers so that it could do no more than raise utility rates to cure the damage from inter-company transactions." *Id*. at 296.

¶50        *Woods'* analysis of the framers' intent is inaccurate.  There is no evidence indicating that the framers envisioned the Commission's ratemaking authority as including management decisions about the structure or organization of a PSC. *Supra* ¶¶ 13–17.  And the text of the constitution itself limits the Commission's exclusive ratemaking powers to

ascertaining the "fair value" of PSCs and prescribing classifications, rates, and charges. Ariz. Const. art. 15, §§ 3, 13, 14; *see Janson on Behalf of Janson v. Christensen*, 167 Ariz. 470, 471 (1991) (stating that the "best and most reliable index of a statute's meaning is its language"); *Phelps Dodge*, 207 Ariz. at 109 ¶ 42 (stating that "[a]rticle 15, [s]ection 3 requires the Commission to 'prescribe just and reasonable . . . rates and charges,' and that "[i]n interpreting this provision, our primary focus is on the intent of the framers, and we do not go outside the plain language of the provision unless the language is unclear") (citations omitted).

**¶51** *Woods* also selectively relied on prior caselaw to support its strained construction of the ratemaking clause. For example, *Woods* construed *Ethington* as holding that any act by the Commission that is conducive to preserving its control over rates while also protecting consumers from financial mismanagement is a "reasonably necessary step[]" in ratemaking. *Id*. at 294–95. But *Ethington* simply held that, as a "necessary step" in performing its ratemaking duties, the Arizona Constitution requires the Commission to determine the fair value of PSCs. *Supra* ¶ 43. Likewise, *Woods* misconstrued *Simms* as holding that the Commission's "legislative" power to set rates grants it broad discretion to regulate corporate finances and management. 171 Ariz. at 294–96. *Simms*, however, was limited to holding that the Commission has "legislative" discretion in determining the methods it uses to calculate fair value. *Supra* ¶ 44.

**¶52** Finally, *Woods* states that based on the framer's intent, the Commission's powers under section 3, and our prior caselaw, courts "*must* give deference to the Commission's determination of what regulation is reasonably necessary for effective ratemaking." 171 Ariz. at 294 (emphasis added). This is incorrect. Neither the text of section 3, the records of the Arizona Constitutional Convention, nor our prior caselaw state that we must defer to the Commission's interpretation of its own ratemaking authority. Although we certainly recognize the constitutional authority of the Commission, it is our duty to interpret the limit and extent of that authority, including whether the Commission's actions are authorized under section 3. *Marbury v. Madison,* 5 U.S. 137, 177 (1803) (stating that "[i]t is emphatically the province and duty of the judicial department to say what the law is"); *see Forty-Seventh Legislature v. Napolitano*, 213 Ariz. 482, 485 ¶ 8 (2006) (stating that "[a]lthough each branch of government must apply and uphold the constitution, our courts bear ultimate responsibility for interpreting its provisions").

¶**53**         *Woods*, of course, recognized that it could not hold that the Commission's ratemaking authority was limitless. Thus, relying on a doctrine known as the "managerial interference doctrine," *Woods* held that the Commission could not use its ratemaking power to control the internal affairs of a corporation. 171 Ariz. at 297; *see Miller v. Ariz. Corp. Comm'n*, 227 Ariz. 21, 26 ¶ 19, 27 ¶ 23 (App. 2007) (same). Specifically, *Woods* stated that although the Commission could enact rules and regulations attempting "to control rates," it was prohibited from enacting rules and regulations attempting "to control the corporation." 171 Ariz. at 297.

¶**54**         Post-*Woods*, the Commission has become increasingly involved in corporate management decisions to ostensibly exercise its ratemaking authority. And, in fidelity to *Woods*, some courts have incorrectly upheld that practice. Thus, for example, in *US West Communications, Inc. v. Arizona Corporation Commission*, the court of appeals, citing *Woods*, held that rules requiring telecommunications companies to obtain approval from the Commission before discontinuing or abandoning certain services emanated from the Commission's ratemaking authority. 197 Ariz. 16, 24–25 ¶¶ 30–36 (App. 1999). The court of appeals reasoned that because such a decision could affect a company's profitability, it might also impact its rates. *Id*. Similarly, in *Miller*, the court, once again relying on *Woods*, held that there was "a sufficient nexus between" the Commission's renewable energy rules and its ratemaking authority. 227 Ariz. at 28–29 ¶¶ 30–31. The court stated that since the subject rules were designed to promote the financial stability of electrical utility companies by requiring them to diversify their electrical energy sources, they would also serve to protect consumers by restraining "upward pressure" on electricity rates. 227 Ariz. at 28–29 ¶¶ 29–31.

¶**55**         As these cases illustrate, because *Woods* extends the Commission's ratemaking authority to virtually every management decision that might affect rates, courts are frequently asked to decide whether the Commission's actions "constitute an attempt to control the corporation rather than an attempt to control rates." 171 Ariz. at 297. However, determining precisely when the line has been crossed between controlling rates and controlling the corporation itself "can be difficult to precisely discern." *Phelps Dodge*, 207 Ariz. at 113 ¶ 64.

**IV.**

¶**56**         We conclude that here, the Commission's ratemaking power does not authorize the Order appointing an interim manager for Johnson.

The Commission purportedly appointed an interim manager to protect "the safety, health, comfort, and convenience of [Johnson's] patrons, employees, and the public" because it deemed Johnson's services, equipment, and facilities to be inadequate and unsafe. *Supra* ¶¶ 4–5. We recognize that the safety and adequacy of Johnson's services and facilities may affect its financial stability, and, as a result, might impact consumer rates. But there must be some limit to what can be reasonably considered ratemaking, and that line has been crossed here.

¶57        We hold, however, that the Commission has the authority to appoint an interim manager pursuant to its permissive power under article 15, section 3. Section 3's permissive clause specifically addresses the problem the Commission's Order seeks to redress—namely, protecting the public from Johnson's alleged inadequate and unsafe services, equipment, and facilities. *Supra* ¶ 26. Additionally, the permissive clause states that the Commission can "make and enforce . . . reasonable *orders*" to protect public health and safety. Ariz. Const. art. 15, § 3; *see also Palm Springs*, 24 Ariz. App. at 128 (stating that the Commission's permissive authority under section 3 includes the power to make reasonable "orders pertaining to particular situations or to particular [PSCs]"). This broad grant of authority necessarily includes appointing an interim manager to remedy threats to public health and safety.

¶58        Notably, the constitution places important limits on the Commission's permissive authority. As an initial matter, before the Commission may issue an order appointing an interim manager, it must provide a PSC with basic due process protections, including notice, a hearing, and the opportunity to present evidence and cross-examine witnesses. *S. Pac. Co. v. Ariz. Corp. Com'n*, 98 Ariz. 339, 346–48 (1965) (stating that orders and other "judicial determination[s]" by the Commission require due process). Section 3, by its terms, mandates that any order, including one appointing an interim manager, must be predicated on, and limited to, protecting and preserving the safety, health, comfort, and convenience of the public. Ariz. Const. art. 15, § 3. Additionally, section 3 expressly requires that any such order must be "reasonable" under the circumstances of each case. *Id*.

¶59        The Commission's permissive authority is also subject to the paramount authority of the legislature to regulate public health and safety. *Supra* ¶ 30. Thus, the legislature may prescribe procedures for the Commission to follow in appointing interim managers, as well as enact laws limiting the powers that such managers may exercise. Ariz. Const. art.

15, § 6. Additionally, because the legislature has delegated its authority to regulate public health and safety to certain administrative agencies, the Commission may not attempt to supplant or deprive such agencies of their delegated authority.

¶60　　　　For example, the legislature has delegated authority to the Arizona Department of Environmental Quality ("ADEQ") to enact and enforce water quality and wastewater standards, as well as enforce those standards with civil remedies and criminal penalties. *See, e.g.,* A.R.S. §§ 49-104, -203, -221 (delegating broad authority to ADEQ to enact water and wastewater safety standards and rules); §§ 49-261, -262, -263 (describing ADEQ's civil and criminal powers to enforce rules and standards regarding water quality); §§ 49-781, -782, -783, -791 (describing ADEQ's civil and criminal enforcement powers regarding violation of wastewater health and safety standards). As a result, the Commission may not unilaterally exercise its permissive authority in a manner that divests ADEQ of its broad regulatory powers over water quality and wastewater.

¶61　　　　We decline, however, to extend *Woods'* construction of the managerial interference doctrine as imposing a limit on the Commission's permissive authority. *Woods*, 171 Ariz. at 297. At bottom, this doctrine is a judicial construct and, as such, cannot be used to lessen or abrogate the Commission's express constitutional authority to "make and enforce reasonable . . . orders for the convenience, comfort, [ ] safety, and . . . health" of the public at-large. Additionally, the managerial interference doctrine has only been applied by *Woods* and its progeny to limit the Commission's ratemaking authority; it has never been applied to the Commission's permissive authority under section 3. *See Woods*, 171 Ariz. at 297; *Phelps Dodge*, 207 Ariz. at 113 ¶ 64; *Miller*, 227 Ariz. at 26 ¶ 19, 27 ¶ 23. *But see Corp. Comm'n v. Consol. Stage Co.*, 63 Ariz. 257, 260–63 (1945) (stating in a non-ratemaking case that the Commission lacks authority to interfere with management decisions regarding the ownership and transferal of stock).

¶62　　　　Nevertheless, our dissenting colleague argues that the management interference doctrine must, as a means to limit the Commission's permissive authority, be used to prohibit the Commission from making interim manager orders. *Infra* ¶ 102. We will not, however, weaponize this doctrine to abrogate the Commission's authority under section 3. And none of the reasons the dissent provides for taking such an extraordinary action are justified by our prior case law. For example, the dissent's reliance on *Southern Pacific* for the proposition that doctrine

applies here is misplaced. Although *Southern Pacific* acknowledged the tension between "management of a corporation" and the Commission's "responsibility of requiring that [PSCs] be operated in the public interest," the Court ultimately concluded that the Commission may issue orders interfering with a PSC's management when necessary to ensure that the public is provided adequate services. *Southern Pac. Co. v. Ariz. Corp. Comm'n*, 98 Ariz. 339, 342 (1965).

**¶63** Similarly, *Consolidated Stage Co.* has no bearing on this case. There, the court simply held that the Commission has no authority to transfer stock *ownership* in a PSC from one party to another. *Consol. Stage Co.*, 63 Ariz. at 259–61, 263. But the Commission's interim manager order does not transfer Johnson's ownership in its company; rather, the order preserves it. *Supra* ¶ 5.

**¶64** Our dissenting colleague's other reasons for applying the doctrine to the Commission's permissive authority are misplaced. His claim that the doctrine is "dictated by the Constitution" is nothing more than a circular argument that relies on his own construction of the Commission's permissive authority. For example, he claims that because the Commission lacks the authority to appoint an interim manager, the doctrine is needed to prevent the Commission from making such an order. But since section 3 does grant the Commission authority to issue an interim manager order when appropriate, the doctrine serves no purpose here. And because orders issued under the Commission's permissive authority must be reasonable and limited to protecting the public, it is unnecessary to apply the doctrine here—section 3 already limits the Commission's ability to interfere in a PSC's management.

**¶65** Similarly, the dissent asserts that the management interference doctrine is necessary to prevent unconstitutional takings and protect private property rights. *See infra* ¶ 73. But given Johnson's status as a PSC, there is no taking here. Finally, we disagree with the dissent's claim that the doctrine is needed to preserve the authority of the courts to issue receivership orders. That reasoning fails because the Commission's authority to make an interim manager order is separate and distinct from the judiciary's authority to issue a receivership order. *Infra* ¶ 68.

**¶66** To summarize, the power of the Commission to issue an order appointing an interim manager falls within its permissive authority under article 15, section 3. However, the exercise of that authority has limits. Section 3 expressly requires that any such order must be "reasonable" and

confined to circumstances predicated on, and limited to, protecting and preserving the safety, health, comfort, and convenience of the public. Judicial review is available to assess whether such an order is thereby "reasonable." Furthermore, issuing such an order is subject to basic due process protections, including notice, a hearing, and the opportunity to present evidence and cross-examine witnesses.

## V.

¶67        Johnson argues that the Order is unconstitutional because the legislature has expressly delegated to the courts the authority to appoint "receivers," and that this legislative exercise of authority conflicts with and is paramount to the Commission's permissive authority to appoint interim managers. *See* A.R.S. § 12-1241 (stating that the superior court has the authority to appoint a receiver); *see also* A.R.S. § 12-1242 (listing procedure for appointing and the powers of a court-appointed receiver); Ariz. R. Civ. P. 66 (to same effect). We disagree.

¶68        The receivership statute is irrelevant to this case. It does not address the Commission's constitutional authority to appoint an interim manager, nor does it, either expressly or impliedly, displace or override the Commission's authority to make such an order. *See* Ariz. Const. art. 15, § 6 (stating that in the absence of legislative action, the Commission's rules and regulations govern). Rather, it simply states that the superior court "*may* appoint a receiver to protect and preserve property or the rights of parties." A.R.S. § 12-1241 (emphasis added). Indeed, rather than limiting the Commission's authority to make interim manager orders, the legislature has enacted laws generally supporting and enhancing the Commission's exercise of such authority. *See* A.R.S. § 40-321(A) (stating that "[w]hen the [C]ommission finds that the equipment, [] facilities or service of any [PSC]" are "unsafe," it "*shall* determine what is . . . safe . . . and *shall enforce* its determination *by order* or regulation") (emphasis added).

¶69        We recognize, of course, that if a court had appointed a receiver for Johnson, the court's order would override the Commission's Order. *See generally Pac. Greyhound v. Brooks*, 70 Ariz. 339, 343 (1950) (holding that a Commission order authorizing a CC&N for a bus company to operate in a service area was void when a prior court judgment enjoined the bus company from operating in the same area). But that is not the case here; there is no judgment or court order that conflicts with the Commission's Order.

¶70    Finally, we are not persuaded by Johnson's claim that pursuant to A.R.S. § 40-422(A), the superior court has the sole authority to issue an order appointing an interim manager. *Id*. (stating that the Commission "shall commence a proceeding in the name of the state" when a PSC is "failing" or "doing" anything that is unlawful, required, or "contrary to . . . any order or requirement of the [C]ommission"). However, § 40-422(A) does not, by its terms, divest the Commission of its constitutional authority to appoint an interim manager. *See Lagerman v. Ariz. State Ret. Sys.*, 248 Ariz. 504, 507 ¶ 13 (2020) (stating that courts have a duty, if possible, to avoid construing statutes in a manner that renders them unconstitutional). Rather, the statute simply provides the Commission with a court enforcement procedure to obtain compliance with its orders.

## VI.

¶71    Our dissenting colleague raises several additional objections to our holding, none of which is persuasive. For example, he claims that the majority's "evanescent reasonableness requirement" is an inadequate limitation on the Commission's authority to make interim manager orders. *Infra* ¶ 118. But this "requirement" is not our creation; it is found in the Constitution itself. Ariz. Const. art 15, § 3. Indeed, "reasonableness" is the touchstone of many important limits on government authority, including search and seizure under the Fourth Amendment. U.S. Const. amend. IV. Confusingly, our dissenting colleague acknowledges that section 3 "unquestionably" allows the Commission "to make reasonable orders." *Infra* ¶ 100. Thus, it seems, he believes that reasonableness is an important limitation for all Commission orders *except* for an interim manager order.

¶72    Our colleague's concern about the reasonableness of interim manager orders is, at bottom, based on his desire to reach the merits of this case. But the Commission's factual conclusions, as well as the reasonableness of its interim manager order, are not before us. Rather, the issue before this Court is whether the Commission has the authority, under any circumstances, to issue an interim manager order. The Commission's factual justifications, as well as the reasonableness of its order, are initially subject to review by the superior court. We will not usurp that court's role.

¶73    Next, the dissent asserts that we must construe section 3 to exclude interim manager orders to avoid "run[ning] headways" into a "constitutional conflict" with the takings clause of the Fifth Amendment and article 2, section 17 of the Arizona Constitution. *Infra* ¶ 106. Of course, to avoid a constitutional conflict there must be one in the first place, and

our dissenting colleague never asserts that an interim manager order constitutes a taking. *Infra* ¶ 106-107. We will not engage in such speculation, particularly when neither party has raised this issue in this case. What is clear is that Johnson, as a PSC operating under a CC&N, has dedicated its property to public use in exchange for being granted a monopoly in its service area. *Pacific Greyhound*, 54 Ariz. at 178; *see also Trico Elec. Co-op, Inc., v. Senner*, 92 Ariz. 373, 380–81, 385 (1962). As a result, Johnson's property is subject to regulation by the Commission, including any regulation necessary to protect public health and safety. *See Nat. Gas Serv. Co. v. Serv–Yu Co–op.*, 70 Ariz. 235, 241-42 (1950) (stating that because public service corporations are dedicated to a public use, they must submit to regulation by the Commission that protects and benefits the public good); *Sw. Transmission Co–op, Inc. v. Ariz. Corp. Comm'n*, 213 Ariz. 427, 432 ¶¶ 24, 25 (App. 2006) (to the same effect). And more importantly, the dissent's conjecture about whether Johnson may be entitled to damages for "just compensation" is simply irrelevant to whether the Commission has the authority under section 3 to enter an interim manager order in the first place.

¶74 Finally, our dissenting colleague's lengthy discussion of the doctrine of enumerated powers is largely rhetorical flourish. We agree that the doctrine applies here, and that the Commission's authority is limited to the powers expressly conferred upon it by the Constitution. *See supra* ¶ 11. And, in fidelity to that principle, we conclude that section 3 grants the Commission the power to make reasonable interim manager orders to protect public health and safety.

¶75 Our dissenting colleague disagrees with this conclusion, but in doing so, he creates a strained and confusing textual construction of section 3. On the one hand, he claims that "nowhere" does section 3 grant the Commission power to make an interim manager order. But, of course, recognizing that the term "orders" must mean something, he claims that section 3 grants the Commission authority to make orders, but only certain *kinds* of orders. *See Morrissey v. Garner*, 248 Ariz. 408, 410 ¶ 8 (2020) (stating that as a constitutional principle "[w]e strive "to give meaning, if possible, to every word and provision so that no word or provision is rendered superfluous") (citation and internal quotes omitted).

¶76 These purported "enumerated" orders encompass a vast array of coercive and remedial orders, including: directing a PSC to "correct the company's inadequacies and ensure its customers are served"; compelling a PSC "to do things, or refrain from doing things"; requiring a

PSC to comply with its "legal obligations"; and "orders that mandate compliance with the Commission's requirements." *Infra* ¶¶ 84, 99, 100. Of course, these broad categories could encompass virtually any type of order. But, coining a phrase outside the plain language of section 3, the dissent claims that interim manager orders cannot be included as permissible orders, because section 3 prohibits orders that "effectuate structural change." *Infra* ¶ 99.

¶77        None of these orders are expressly referenced in section 3. And that is the primary flaw in the dissent's analysis. Section 3 does not "list" *any* specific kinds of remedial or injunctive orders, nor does it make a distinction between permissible and impermissible orders. Rather, it simply states, in broad terms, that the Commission has the authority to "make and enforce reasonable orders" to protect public health and safety. Thus, our dissenting colleague has no basis to exclude interim manager orders from the broad language of section 3, while including his own preferred orders.

¶78        Setting aside the text of section 3, the dissent argues that because interim manager orders are absent from the list of orders enumerated under Title 40, we should read this as a limitation of the Commission's authority under section 3. *Infra* ¶ 99; A.R.S. § 40–336. This, he contends, shows that if the "Commission *needs* specific legislation" for issuing minor compliance orders, such as requiring PSCs to install safety devices," it "makes little sense" that it has the power to make an interim manager order. (Emphasis added). *Infra* ¶ 99.

¶79        This argument ignores the Commission's authority under section 3. The Commission does not "need" any legislation to exercise its permissive authority under section 3; its authority is self-executing. *Supra* ¶ 26. Further, the Commission's permissive authority is not delegated to it by the legislature but is conferred by the Constitution. Indeed, apart from a conflict between the legislature's police powers and the Commission's permissive authority, the legislature may only enlarge, not lessen, the Commission's authority. *Supra* ¶¶ 31–32; Ariz. Const. art. 15, § 6.

¶80        In essence, our dissenting colleague appears to be uncomfortable with the broad authority the people of Arizona conferred upon the Commission. But it is not the prerogative of this Court to re-write or ignore constitutional provisions with which we disagree. *See Azar v. Allina Health Services*, __ U.S. __, 139 S.Ct. 1804, 1815 (2019) (stating that "courts aren't free to rewrite clear statutes under the banner of our own

policy concerns"). Rather, it is our duty to interpret and construe the constitution. We leave it to the people to change it, if they wish.

## Conclusion

¶81      For the foregoing reasons, we vacate the court of appeals' opinion and hold that the Commission may appoint an interim manager based on its permissive authority under article 15, section 3 of the Arizona Constitution.

Bolick, J., concurring in part and dissenting in part:

¶82            The majority usefully and properly corrects decades of decisions incorrectly holding that the Corporation Commission's plenary ratemaking power encompasses not only setting rates but also substantive regulatory authority. *See, e.g.*, *Ariz. Corp. Comm'n v. State ex rel. Woods*, 171 Ariz. 286 (1992); *Miller v. Ariz. Corp. Comm'n*, 227 Ariz. 21 (App. 2011); *US W. Commc'ns, Inc. v. Ariz. Corp. Comm'n*, 197 Ariz. 16 (App. 1999). I therefore join the majority's analysis of the Commission's ratemaking powers.

¶83            But what the Court taketh away, it gives back and much more through an overly expansive construction of the Commission's "permissive" authority.  As the majority's decision vests power in the Commission far beyond the circumscribed role contemplated by our constitution, I respectfully dissent from the remainder of the majority's opinion and its disposition.

¶84            It is often remarked that bad facts make bad law, and this decision proves the adage.  Johnson Utilities was found by the Commission to have failed to provide adequate service, equipment, and facilities and to have engaged in inadequate billing practices and financial mismanagement. *Supra* ¶ 4.  The Commission is empowered to take action to correct the company's inadequacies and ensure its customers are served but is not constitutionally authorized to unilaterally displace the owners' management of the company and vest control over the company's assets and management in a competitor.

¶85            The majority treats the Commission's action as an unremarkable order that is justified, to the extent it needs justification at all, by the exigent circumstances found by the Commission.  With respect, the removal of a company's management, assets, and control from its owners is an extreme remedy in a nation that sanctifies private property rights and the rule of law.  The Commission may exercise such power only if clearly authorized by the constitution or statutes.

¶86            Nor do exigencies provide such authority.  The endurance of a constitution that confers limited and defined powers upon government is most seriously tested in times of crisis.  A perceived emergency may require government action that presses the boundaries of its authority, but it cannot expand that authority.  It is the judiciary's job to scrupulously police those boundaries lest they disappear. *Cf. Marbury v. Madison*, 5 U.S. 137, 177

(1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

¶87        One of the most revered U.S. Supreme Court decisions in the past century involved a similar action, albeit on a far greater scale, and we should draw upon that decision's wisdom for its categorical rejection of unbounded government power even in time of crisis. In *Youngstown Sheet & Tube Co. v. Sawyer*, the Court reviewed an executive order taking possession of several steel companies and directing the companies' presidents to serve as operating managers on behalf of the United States. 343 U.S. 579, 583 (1952). The order was issued in response to a nationwide strike that threatened national defense because it jeopardized steel production necessary for the war effort. *Id.* at 582–83.

¶88        In a decision by Justice Hugo Black, the Court declared that the President's power to issue such a sweeping order "must stem either from an act of Congress or from the Constitution itself." *Id.* at 585. The Court held that no statute or constitutional provision expressly authorized such an order. *Id.* at 586–87. The President argued that authority "should be implied from the aggregate of his powers under the Constitution." *Id.* at 587. But the Court rejected that notion based on separation of powers, holding that "the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute." *Id.* Because Congress did not expressly delegate authority to the President, the Court held he did not possess it. *Id.* at 588–89. The Court concluded that "[t]he Founders of this Nation entrusted the law making power to the Congress alone in both good and bad times," a choice that reflected their "fears of power" and "hopes for freedom." *Id.* at 589.

¶89        The concurring opinions also contained insights we should heed. Justice Robert Jackson warned that judges "often suffer the infirmity of confusing the issue of a power's validity with the cause it is invoked to promote." *Id.* at 634 (Jackson, J., concurring). He rejected the doctrine of "nebulous, inherent powers" to "deal with a crisis or an emergency according to the necessities of the case, the unarticulated assumption being that necessity knows no law." *Id.* at 646. Likewise, Justice William O. Douglas emphasized that "the emergency did not create power; it merely marked an occasion when power should be exercised." *Id.* at 629 (Douglas, J., concurring).

¶90        In assessing a similar action here, we should follow exactly the course set forth in *Youngstown*, determining in light of our constitutional

text and structure whether the powers exercised by the Commission were conferred upon it by the constitution or the legislature.

¶91 Under our constitution, the Corporation Commission enjoys a status unique among agencies, exercising powers bestowed not only by the legislature but also directly by the constitution itself. For that reason, it is sometimes referred to as a "fourth branch" of government. *See, e.g., Ariz. Corp. Comm'n v. Superior Court*, 105 Ariz. 56, 60 (1969). Whatever the accuracy of that depiction at the time our constitution was ratified and in the century-plus since, it is unquestionably sanctioned by today's holding.

¶92 That role was not contemplated by our constitution, whose language and structure establish that the Commission is limited to its express powers. Although the Commission is created as a separate and distinct constitutional entity, the Arizona Constitution nonetheless creates a government comprised of three branches, not four. In that system, any powers not expressly conferred upon the Commission reside with one of the three branches of government, or the people.

¶93 Article 2, section 2 of our constitution provides that "governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights." Ariz. Const. art. 2, § 2. This is the prism through which all government actions must be assessed. The constitution goes on to devote an entire article, short and sweetly succinct, to the separation of powers. Article 3 provides in its entirety:

> The powers of the government of the state of Arizona shall be divided into three separate departments, the legislative, the executive, and the judicial; and, except as provided in this constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others.

Ariz. Const. art. 3.

¶94 By its unequivocal terms, the separation of powers article makes clear that the authority assigned to each branch of government is inviolate. Just as none of the three branches of government may invade powers assigned to another, certainly the Commission may not do so.

¶95 Article 4, part 1, section 1 provides in relevant part that "[t]he legislative authority of the state shall be vested in the legislature." In our

republic, states are the organic units of government and are invested with the police power—that is, the power to regulate private affairs for public health, safety, or welfare. *Jacobson v. Massachusetts*, 197 U.S. 11, 24–25 (1905); *see also* U.S. Const. amend. X; *Police Power*, Black's Law Dictionary (11th ed. 2019). Under our constitution, the police power is vested exclusively in the legislature, as the majority acknowledges. *Supra* ¶ 28. Thus, if a regulatory power is not expressly delegated to the Commission by either the constitution or legislature, it remains with the legislature. *See City of Surprise v. Ariz. Corp. Comm'n*, 246 Ariz. 206, 212 ¶ 20 (2019); *Corp. Comm'n v. Pac. Greyhound Lines*, 54 Ariz. 159, 176 (1939) ("[T]he paramount power to make all rules and regulations governing public service corporations not specifically and expressly given to the commission by some provision of the constitution, rests in the legislature.").

¶96        Ironically, the majority purports to apply the exact same governing principle, that the Commission "'has no implied powers and its powers do not exceed those to be derived from a strict construction of the Constitution and implementing statutes.'" *Supra* ¶ 11 (quoting *City of Surprise*, 246 Ariz. at 212 ¶ 20 (citation omitted)). That principle, which inheres in our constitutional language and structure, is about as limiting as any I have seen applied to any governmental entity. An "implied power" is one "that is not enumerated but that nonetheless exists because it is needed to carry out an express power." *Implied Power*, Black's Law Dictionary (11th ed. 2019). "In addition to enumerated powers, all three branches possess a number of implied powers: powers that can be reasonably drawn from express powers." Louis Fisher, *The Law of the Executive Branch: Presidential Power* 1 (2014). But as the majority correctly observes, the Commission possesses no implied powers; it has only express powers, and indeed only those that appear from a strict construction of the constitutional or statutory language.

¶97        The majority does not identify any express authority to remove control of a company from its owners, but instead points to the generic language of the Commission's permissive authority, holding that "[t]his broad grant of authority necessarily includes appointing an interim manager." *Supra* ¶ 57. That is a textbook example of implied authority, which the majority correctly says the Commission does not possess. Instead, the majority construes the authority of "making . . . orders" to encompass *any* orders pertaining to the convenience, comfort, and safety of a public service corporation's patrons, no matter how invasive of the company's ownership and control or its constitutional rights. Respectfully, that is not express authority, nor is it derived from a strict construction of

31

the applicable language. Indeed, it could not be, given that it transforms the Commission's limited and defined powers into boundless authority so long as it is exercised in the form of an "order." We should not attribute to our constitution's framers an intent to so greatly elevate form over substance.

¶98 Article 15, section 3 of the Arizona Constitution, upon which the majority relies, provides the Commission with authority to "make and enforce reasonable rules, regulations, and orders for the convenience, comfort, and safety, and the preservation of the health, of the employees and patrons" of public service corporations. Moreover, A.R.S. § 40-321 authorizes the Commission, upon findings of inadequacy on the part of a public service corporation, to "determine what is just, reasonable, safe, proper, adequate or sufficient, and shall enforce its determination by order or regulation."

¶99 A "strict construction" of those authorizations would, it seems to me, limit the Commission to orders that mandate compliance with the Commission's requirements rather than effectuate structural corporate change. Indeed, this narrow construction of § 40-321's statutory authorization is reinforced by subsequent statutory authorizations that are quite granular. *See, e.g.*, § 40-325 (Commission may order physical connections between railroad lines); § 40-329 (may order connections and joint rates between telephone and telegraph companies), § 40-332 (may order joint use of facilities belonging to a public service corporation), § 40-336 (may require safety devices). *See generally* §§ 40-322 to -340. The notion that the Commission needs specific legislative authorization to require safety devices, yet possesses implicit power to transfer control over a corporation to its competitor, makes little sense.

¶100 Unquestionably, the Commission is authorized by the constitutional and statutory language to make reasonable orders to companies within its jurisdiction to do things, or refrain from doing things, for the convenience, comfort, safety, or health of their patrons. But an order requiring that a public service corporation take some specified action is seismically different from an "order" removing the corporation's management from the owners.

¶101 The majority repeatedly refers to the order as the appointment of an interim manager, suggesting the mere substitution of one corporate official for another, but in fact it is far more sweeping. The Commission's order transfers to EPCOR, Johnson's rival, control of the

company's management and assets. *Supra* ¶ 6. EPCOR in turn reports solely to the Commission, not to Johnson. *Id.* Johnson is reduced to making suggestions and complaints to EPCOR and the Commission. The Commission's counsel stated at oral argument, not very reassuringly, that Johnson "can sit down and talk with EPCOR. Nothing precludes Johnson from coming to . . . discuss with the Commission the ongoing operations of that utility. They are not precluded from coming to sit down with staff to make their case before the Commission." Johnson may seek to terminate the order, but only "upon a showing that [the company's] services 'are in all respects just, reasonable, safe, proper, adequate, and sufficient.'" *Id.* ¶ 5. In other words, the company's owners can get their business back only if they prove that their competitor, which is now running the company, has done a sufficiently splendid job. The Commission's order dissolves any meaningful ownership interest into the role of a passive bystander.

¶102 The Commission's order far exceeds its authority to require compliance with the company's legal obligations, and instead insinuates itself deeply into Johnson's corporate governance. Arizona courts have long recognized a line of demarcation, discarded by the majority today, that reflects constitutional boundaries and protects against actions that exceed the Commission's broad yet circumscribed authority: the management interference doctrine.

¶103 In *Southern Pacific Co. v. Arizona Corp. Commission*, this Court struck down a Commission order requiring a railroad to maintain existing train schedules, declaring that "plainly it is not the purpose of regulatory bodies to manage the affairs of the corporation." 98 Ariz. 339, 343 (1965). The Court emphasized that the state "'is not the owner of the property of public utility companies, and is not clothed with the general power of management incident to ownership.'" *Id.* (quoting *Missouri ex rel. Sw. Bell Tel. Co. v. Pub. Serv. Comm'n of Mo.*, 262 U.S. 276, 289 (1923)). The Court also examined legislative authority that gave the Commission "power to do those things necessary and convenient in the exercise of the granted powers," but held that did not "give[] the Commission the right to rearrange petitioner's train service *without a judicial determination that the service so provided is inadequate.*" *Id.* at 348 (emphasis added). A holding that the Commission could unilaterally impose the order, the Court observed, "unconstitutionally deprives petitioner of its property without due process of law. It is a nullity." *Id.*; *see also Corp. Comm'n v. Consol. Stage Co.*, 63 Ariz. 257, 261 (1945) (holding that a forced stock transfer exceeded the Commission's authority by controlling the internal affairs of a corporation); *Phelps Dodge Corp. v. Ariz. Elec. Power Co-op, Inc.*, 207 Ariz. 95, 113 ¶ 59 (App.

2004) ("[W]e will not infer the grant of authority to interfere with the [utilities'] management decisions beyond the 'clear letter of the statute.'") (citing *S. Pac.*, 98 Ariz. at 343).

¶104 The majority responds that the management interference doctrine is a "judicial construct" and, in any event, is limited to the exercise of the Commission's ratemaking powers. *Supra* ¶ 61. It would be odd for the Court to have made such repeated categorical statements about the absence of Commission authority to control internal corporate affairs, only to have that power, undiscovered until today, lurking about in the very same sentence of article 15, section 3 all this time. To the contrary, the Court made quite clear that "[n]owhere in the Constitution or in the Statutes is the commission given jurisdiction, directly or by implication, to control the internal affairs of corporations." *Consol. Stage,* 63 Ariz. at 261. "Nowhere" is a vast place, and surely encompasses not only the Commission's ratemaking power but its permissive regulatory authority as well.

¶105 Nor was the management interference doctrine invented by the Court, but was dictated by the constitution, in three discrete ways. First, it is another way of expressing the constitutional principle we have all acknowledged, that the Commission possesses only those powers expressly conveyed by the constitution or statutes. No express power to invade core management functions appears in the constitution and statutes; hence such power does not exist. Second, interfering in management functions invades the corporation's private property rights and is therefore a "nullity." *S. Pac.*, 98 Ariz. at 348. Finally, it trespasses the separation of powers because the Commission may seek to direct corporate governance only through judicial decree. *Id.* That the Court today dislodges those constitutional limits, even without urging by the Commission,[1] underscores that its decision bestows broad and previously unrecognized power upon the Commission.

¶106 In addition to strictly construing constitutional and statutory authorization for the Commission's actions, we must interpret such language, if possible, in order to avoid constitutional conflict. *See, e.g., Slayton v. Shumway*, 166 Ariz. 87, 92 (1990) ("[W]here alternate constructions

---

[1] Indeed, as the Commission acknowledged in its brief, "[t]he management interference doctrine serves as a check on the Commission's power so that [it] will be prevented from becoming the *de facto* manager of public service corporations instead of taking actions to control rates or address public health and safety problems." That vital check is removed by this decision.

are available, we should choose that which avoids constitutional difficulty."); *Greyhound Parks of Ariz., Inc. v. Waitman*, 105 Ariz. 374, 377 (1970) (explaining and applying canon of constitutional avoidance); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 247–51 (2012). *Southern Pacific* recognizes that an exercise of Commission authority that strays beyond its ratemaking or regulatory power to control the inner workings of a corporation necessarily raises concerns over constitutional protections of private property rights. *See* 98 Ariz. at 348.

¶107 The majority's broad construction of the Commission's power runs us headways into constitutional conflict. Although Johnson Utilities does not raise a takings claim here under the Fifth Amendment to the U.S. Constitution or article 2, section 17 of the Arizona Constitution, such concerns are necessarily implicated, given that, as the U.S. Supreme Court observed in *Youngstown*, the government's actions in taking control of the steel companies "were bound to result in many present and future damages." 343 U.S. at 585. Thus, the Court held in *United States v. Pewee Coal Co.* that the temporary takeover of a private mine constituted a taking and that the government was liable for damages sustained while in possession. 341 U.S. 114 (1951). These concerns are therefore highly pertinent to our interpretation of the Commission's constitutional and statutory authority.

¶108 Article 2, section 17 speaks directly to the allocation and limitations of government power with respect to private property rights. It provides: "No private property shall be taken or damaged for public or private use without just compensation having first been made, paid into court for the owner, secured by bond as may be fixed by the court, or paid into the state treasury for the owner on such terms and conditions as the legislature may provide . . . ." Ariz. Const. art. 2, § 17.

¶109 In this context, article 2, section 17 establishes two important baseline principles. First, *before* the government takes or damages private property, it must take steps to ensure the owner will be compensated for losses. Second, that to ensure the owner is compensated for any losses, bond or payment must be made according to judicial or legislative process. Yet, the majority's holding would allow the Commission not only to transfer management and control over the company to another private entity as it has here, but also to take the property altogether, without following these constitutional dictates, so long as it takes the form of an order and a court subsequently deems it was reasonable. Given their

manifest concern for the protection of private property rights, it seems inconceivable that the constitution's framers meant to give the Corporation Commission, alone among governmental entities, sweeping authority to transfer control and operation of a private enterprise without judicial or legislative process. Certainly, we should search very carefully for such express authority and resolve all doubts against it.

¶110 Given that no express constitutional or statutory authority is conferred upon the Commission to manage the internal affairs of a company either directly or through a hand-chosen proxy, and that serious constitutional concerns are raised by implying such authority, does that mean that the Commission is powerless to instigate a change of management where circumstances warrant? In the *Youngstown* context, Congress "prescribed for the President specific procedures, exclusive of seizure, for his use in meeting the present type of emergency." 343 U.S. at 660 (Burton, J., concurring). So too has the legislature here provided an appropriate vehicle for the action sought by the Commission: an action for receivership.

¶111 Arizona Revised Statutes § 12-1241 provides that the "superior court or a judge thereof may appoint a receiver to protect and preserve property or the rights of parties therein, even if the action includes no other claim for relief." Receiverships are an equitable remedy that may be sought by anyone, and may be used to operate a business while litigation is pending. *First Phx. Realty Invs. v. Superior Court*, 173 Ariz. 265, 266 (App. 1992); 3 *Ariz. Legal Forms, Debtor-Creditor Ch. 13*, Introduction at 1 (2d ed. 2019). A receivership is a "drastic remedy" and the power to appoint is "justly safeguarded, and reluctantly exercised, by the courts." *Tate v. Phila. Transp. Co.*, 190 A.2d 316, 321 (Pa. 1963). The court has broad discretion to assign duties to the receiver, Ariz. R. Civ. P. 66(c)(1), who must first post a bond before performing the duties, Ariz. R. Civ. P. 66(b)(2).

¶112 The Commission is expressly authorized to file a lawsuit pursuant to A.R.S. § 40-422(A) to enforce its orders, and such action plainly would serve as an appropriate predicate for seeking a receivership if one is necessary. Indeed, that statute goes even further by directing that the Commission "shall" commence such a proceeding "[w]hen [it] is of the opinion that a public service corporation is failing or about to fail to do anything required of it by law or an order or requirement of the commission." The Commission certainly was of this opinion as regards Johnson; thus, it was required to go to court to seek enforcement.

¶113    Compare this prescribed and well-established judicial procedure with the order imposed by the Commission. A court considering a receivership is a neutral decisionmaker that appoints a disinterested person as receiver, Ariz. R. Civ. P. 66(b)(1)–(2), thus protecting the due process rights of the property owner. The receiver has a duty to protect and preserve the property and the rights of the parties. *Gravel Res. of Ariz. v. Hills*, 217 Ariz. 33, 37 ¶ 10 (App. 2007). The receiver's obligations are secured by an oath and bond. Ariz. R. Civ. P. 66(b)(2). Courts in other states have appointed receivers, with the protections afforded by judicial process, under analogous circumstances. *See, e.g.*, *United States v. City of Detroit*, 476 F. Supp. 512 (E.D. Mich. 1979); *Dep't of Envtl. Prot. v. Emerson*, 563 A.2d 762 (Me. 1989); *Genssler v. Harris Cnty.*, No. 01-10-00593-CV, 2010 WL 3928550 (Tex. App. Oct. 7, 2010).

¶114    By contrast, the Commission asserts it is unilaterally empowered to impose this drastic equitable remedy without the attendant judicial process and its careful balancing of rights and interests. At oral argument, counsel was repeatedly asked why the Commission did not go to court to request a receivership. The response was that it did not have to. Why go through the burden, inconvenience, and second-guessing of judicial process when the end can be accomplished through agency fiat?

¶115    The majority vindicates the Commission's view by suggesting that because the statute does not expressly require the Commission to use the receivership process, it need not do so. That states the proper inquiry exactly backward: if the power is not expressly conferred, the Commission does not possess it. *See City of Surprise*, 246 Ariz. at 212 ¶ 20; *Comm. Life Ins. Co. v. Wright*, 64 Ariz. 129, 139 (1946) ("The Corporation Commission has no implied powers and its powers do not exceed those to be derived from a strict construction of the Constitution and implementing statutes."). We must satisfy ourselves that the constitution or statutes expressly invest the Commission with power to accomplish the objectives of the receivership statute without needing to comply with its important procedural requirements.[2]

---

2    By contrast, the legislature vested "jurisdiction over all petitions requesting that a school district be placed in receivership" in the state board of education. A.R.S. § 15-103(D). The delegation of receivership authority to one entity, with no such delegation to another entity, strongly implies that the second entity possesses no such authority. *See City of Surprise*, 246

¶116     The existence of a receivership statute from which the legislature has exempted a different agency but not the Commission, plus our own rules creating significant procedural preconditions for such a drastic equitable remedy, along with a statute empowering the Commission to seek judicial enforcement of its orders and directing it to do so in the circumstances presented here, establish that the Commission does not possess unilateral authority to coercively transfer management of a business to a third party, even beyond the absence of express authority to do so. The constitutional implications of failure to secure judicial process further support that conclusion. *See supra* ¶ 106.

¶117     My colleagues contend that I am adding limitations to the Commission's authority that do not appear in the constitutional text. *Supra* ¶ 76. But as both the majority and I have described our task in this case, we are not searching for language that limits the Commission's authority, nor is it necessary to create such language. Rather, we are searching for words that expressly empower the Commission to take the drastic action at issue here. I have not found such words in the constitutional text or statutes. Neither have my colleagues.

¶118     The Court today recognizes sweeping implied authority on the part of the Commission to control public service corporations even to the extent of unilaterally divesting critical facets of ownership. Having removed any meaningful substantive limit to the Commission's power, that power is now backstopped only by a post hoc judicial inquiry applying the evanescent requirement of reasonableness. As the Commission flexes its newfound authority, future courts may be hard-pressed to put the genie back in the bottle. I would render that task unnecessary by limiting the Commission's permissive authority to the regulatory powers expressly conferred by the constitution and statutes. With great respect to my colleagues, I dissent from the disposition affirming the Commission's order and its underlying reasoning.

---

Ariz. at 211 ¶¶ 13–14 (explaining and applying *expressio unius est exclusio alterius* canon); *see also* Scalia & Garner, *supra* at 107–11.